IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| LUCA INTERNATIONAL GROUP, LLC[1] | § | CASE NO. 15-34221-H2-11 |
| | § | |
| | § | Joint Administration Pending |
| | § | Judge David R. Jones |
| Debtors | § | |

**AFFIDAVIT OF LORETTA R. CROSS IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF**

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before the undersigned notary public appeared Loretta R. Cross who, after being sworn, testified as follows:

1.  My name is Loretta Cross. I am over the age of twenty-one (21), am competent to make this *Affidavit*, and have never been convicted of a crime. I have personal knowledge of the facts as stated in this *Affidavit*. I am authorized to execute this *Affidavit* on behalf of LUCA International Group, LLC ("LIG"), LUCA Operation, LLC ("LO"), LUCA International Group (Texas), LLC ("LIG TX"), LUCA Barnet Shale Joint Venture LLC ("LBS"), LUCA Energy Fund LLC ("LEF"), LUCA Energy Resources LLC ("LER"), LUCA I LP ("LI"), LUCA II LP ("LII"), LUCA Oil, LLC ("LOL"), LUCA Oil II Joint Venture ("LOII"), LUCA To-Kalon Energy LLC ("LTK"), LUCA Resources Group LLC ("LRG") (collectively referred to as the "Luca Entities").

---

1 The Debtors in these cases, along with the last four digits of their respective taxpayer ID numbers, are Luca International Group LLC (1086), Luca Operation, LLC (0343), Luca International Group (Texas) LLC (5577), Luca Barnet Shale Joint Venture, LLC (5340), Luca Energy Fund LLC (0677), Luca Energy Resources, LLC (0000), Luca Resources Group, LLC (1699), Luca I, LP (4104), Luca II, LP, (9778), Luca Oil, LLC (8161), Luca To-Kalon Energy LLC (3922), Luca Oil II Joint Venture (6604).

2.      I currently serve as the Chief Restructuring Officer (the "CRO") of LIG, LO, Luca Asset Management LLC, Luca Energy Fund  LLC, Luca I LP, Luca II LP, Luca Energy Resources, Luca Resource Group LLC, Luca Oil II, Luca To-Kalon Energy, Luca Oil, Petro Capital LLC, Petro Equipment Trading Corp., Sinotex Energy California LLC, Luca Barnett Shale Joint Venture, LLC, Luca Barnett Shale Resources, LLC and US – China Energy Summit.  I have served in that capacity since July 16, 2015.

3.      In my capacity as the CRO, I am familiar with the daily operations and financial conditions of the Luca Entities. I hereby submit this affidavit in support of the Debtors' first day motions in the above-captioned chapter 11 cases and to assist the Court and other parties-in-interest in understanding the circumstances leading up to the commencement of these cases. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the Debtors' operations, financial condition and the industry as a whole. If called to testify, I would testify competently to the facts set forth herein. I am authorized by the Debtors to submit this Affidavit.

## I. Background

4.      On August 6, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "Bankruptcy Code"). The Debtors continue to maintain their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' bankruptcy cases and no official committee of unsecured creditors has been established.

5.      The purpose of the filing is to sell the Debtors' assets and create a source of funds that can be used to repay creditors (including claims by litigants) and return any remaining amounts to investors.   I will also be responsible for evaluating other sources of recovery and investigating causes of action.

**A.  Debtors' Business**

6.      The Luca Entities are engaged in the exploration and production of natural gas, petroleum and related hydrocarbons.  The primary assets are located in Iberville and Ascension Parishes in Louisiana.  These assets include 3 operating oil and gas wells – Belle Grove 1, Dugas & Leblanc 1 and Jumonville 2.  In addition, the assets include a water disposal well, Acosta 1, and a shut-in oil and gas well, Jumonville 1. The Luca Entities also own oil and gas leases in Texas and working interests in various locations.

7.      LO has a draft reserve report that was prepared in March by Gustavson Associates. The reserve report indicates that the Debtors have proved developed non-producing and proved behind pipe net reserves of approximately 3.2 billion cubic feet of gas and 450 million barrels of oil.  The reserve report did not provide an estimated value for proved undeveloped, probable or possible reserves.

8.      The Luca Entities administrative office is located at 12 Greenway Plaza, Suite 1168, Houston, Texas 77042.

9.      The Luca Entities were founded in 2005 and currently have a staff of six employees, in addition to the CRO.  Each receives an annual salary.

**B.  Corporate Structure**

10.     The Luca Entities are a collection of affiliated companies.  The following table shows the entities and their registration state.

| Entity | Registered state and type of entity |
| --- | --- |
| Luca International Group LLC | California Limited Liability Company ("LLC") |
| Luca Operation LLC | Louisiana LLC |
| Luca Energy Fund, LLC | Texas LLC |
| Luca International Group (Texas), LLC | Texas LLC |
| Luca Oil, LLC | Texas LLC |
| Luca I Limited Partnership | Texas Limited Partnership |
| Luca Barnet Shale Joint Venture LLC | California LL |
| Luca To-Kalon Energy LLC | Texas LLC |
| Luca Energy Resources, LLC | Delaware LLC |
| Luca Resources Group, LLC | Texas LLC |
| Luca II Limited Partnership | Texas Limited Partnership |

11.     The following organization chart shows the known control relationships among the Luca entities. Bingqing Yang is the sole member of each of the entities with orange coloring. The other entities appear to be owned jointly by Ms. Yang and third parties.



## C.  Pre-petition Capital Structure of the Debtors

12.     The Debtors are owned by Ms. Yang. There is no holding company to serve as an intermediary between Ms. Yang and the Debtors. Ms. Yang directly owns member interests in the managing entities or operating entities. Luca International Group LLC (CA) and Luca Operation LLC are the primary operating companies.

13.     Ms. Yang financed the Debtors and affiliated companies primarily by raising money from foreign investors in China and Japan. Some of the investors participated in an EB5 visa program that Ms. Yang organized. These funds were typically placed into one entity and then used to pay expenses for one of the operating companies or lent to one of the operating companies. There are SEC allegations of funds being misspent, used for purposes other than what is described in the formation documents and

possibly used for Ms. Yang's personal expenses. I intend to conduct a thorough forensic analysis to understand how these funds were used and if the transfers were intercompany loans or equity investments in the subsidiaries. In addition, we will determine if funds or assets were transferred out of the Luca entities that could be recovered using the means that are available to me under the Bankruptcy Code.

14.     In addition to the investor money, the balance sheets indicate that there may be significant loans made to the Luca Entities. We are in the process of obtaining the documentation for these loans. Some of the loans may be related to investor funds, or insider funds that were invested in one entity and later loaned to another entity. Often times the money that was obtained by the operating entities, did not come with appropriate documentation. Therefore, my investigation will be necessary to determine what the nature of these transactions were and to determine their place in the priority scheme.

**D. SEC Litigation**

15.     On July 6, 2015, in the Northern District of California, the Securities and Exchange Commission filed suit against Luca International Group, LLC; Luca Resources Group, LLC; Luca Energy Fund, LLC; Entholpy Emc, Inc.; Bingqing Yang; Lei (Lily) Lei; Anthony V. Pollace; and Yong (Michael) Chen. Also named in the suit as relief defendants were Luca Operation, LLC; Luca Barnett Shale Joint Venture; Luca To-Kalon Energy, LLC; Luca Oil, LLC; Luca I, Limited Partnership; Luca Oil Ii Joint Venture; J&Q Int'l Trading, Inc.; Skyline Trading, LLC; and Xiang Long Zhou.

16.     The SEC litigation alleges that the investors' funds were not spent appropriately or in accordance with the fund raising documents.

17.    The SEC has moved for the appointment of a receiver along with other restrictive measures.  The Luca entities are in the process of assessing the SEC's requests, and will determine what actions we can agree to accept and which will be made moot by the filing of the Chapter 11 proceeding.

**II. Events Leading Up to the Commencement of the Chapter 11 Cases**

18.    The company is simply out of cash.  The company owes more to trade creditors than it can pay for out of its current operating cash flow.  Over $500,000 of liens have been placed against the Belle Grove #1 well.  Exploration and development costs were apparently excessive and drained the Debtors' cash.  The debtor entities have been selectively marketing the properties for sale to foreign buyers.  They were not successful in finding a buyer for the assets in a time frame that would have avoided a Chapter 11 filing.

19.    A number of lawsuits have been filed against the company including collection actions, lien assessments and the litigation that lead to the SEC complaint.  The company needs the protection of the automatic stay to allow for the time to execute an open sales process that will allow it to address the payment of creditors with the remainder being available to provide a return of investor funds.

20.    To provide for the continued operations of the oil fields and to execute an open sale process will require access to additional capital.  We have obtained Debtor In Possession ("DIP") financing which we believe will be sufficient to fund the company during the sales process.  As is typical in situations like this one, the lender requires the protection of the bankruptcy court as a condition to advancing funds to the Debtors.

### III. Summary of the Debtors' Intention

21.     The Debtors intends to use the next month to prepare the assets for a sale.  This will include addressing maintenance needs, hiring an investment banker, stabilizing the production numbers and updating the reserve report.

22.     The intention is to spend a reasonable period of time marketing the assets, estimated to be three to four months.  This will ensure that we give new buyers time to do adequate due diligence, thus enhancing the value of the bids.  In addition, we will re-engage with potential buyers that have already been in discussions with the Luca Entities.

23.     In addition to the sales process, a forensic investigation must be done to assess if funds received from the investors, or borrowed from other sources left the Luca Entities for inappropriate uses.  I will utilize the bankruptcy court as a means to pursue the recovery of those funds.

### IV. Facts in Support of the first Day Motions

**A.  DIP Facility**

24.     I have actively attempted to raise financing dollars from various sources over the last few weeks.  After approaching numerous parties and entering into due diligence with three parties, we have found a party that is willing to provide the company with DIP financing.

25.     This particular loan was very difficult to arrange because of the nature of the collateral, its small size and the pending SEC complaint.  In addition, at this point and time the Debtors only  have three wells capable of producing oil and gas, therefore, there is a disproportionate risk to the lender when the collateral is

concentrated in so few producing assets.  The following are a summary of the

PROPOSED terms:

| Borrowers | Luca Operation LLC and Luca International Group LLC |
|---|---|
| Facility Amount; Conditions to Funding of Second Draw | The DIP Facility shall comprise a commitment for up to $2,000,000.  The DIP Facility may be funded through an Interim Draw and Subsequent Draws as set forth below. |
| Use of Proceeds | The proceeds of the DIP Facility shall generally be used (1) to finance working capital needs, specified capital expenditures and general corporate purposes of the Debtors, all in accordance with the applicable DIP Budget; (2) to pay the fees, costs and expenses incurred by the Debtors in connection with their chapter 11 cases; and (3) to pay interest to and the fees, costs, and expenses of the DIP Lender. |
| Interest Rate | LIBOR + 15%, with a LIBOR floor of 3%.  Upon disbursement of the Interim Draw, interest shall at all times accrue on the greater of: (1) the Borrowers' outstanding balance under the DIP Facility; or (2) $1 million, until all amounts owed by the Borrowers under the DIP Facility have been paid in full. |
| Commitment Fee | 2.5% of the Facility Amount, payable upon funding of the Interim Draw. |
| Collateral Monitoring Fee | $11,000 per month; no additional financial advisory or collateral monitoring fees of the Lender will be billed to Luca. |
| Due diligence expense reimbursement | Initial advance of $30,000, reasonable expenses only |
| Interim Draw | $200,000, funded upon approval of the Interim DIP Motion to be filed as one of the first day motions by an Order acceptable to the DIP Lender in its sole discretion. |
| Subsequent Draws and availability thereof | The Subsequent Draws shall be available upon entry of an order by the Bankruptcy Court granting final approval of the DIP Facility that is in form and substance acceptable to the DIP Lender in its sole and absolute discretion and subject to receipt by the DIP Lender of a current reserve report for the borrowers' interest in the mineral interests (and omitting third party interests), as reported by the debtors, showing proved reserves in excess of $4 million of which at least $2.5 million are proved developed producing (PDP) reserves.

The Subsequent Draws shall be in increments of at least $250,000.  The first Subsequent Draw will be for $800,000, |

| | |
|---|---|
| | payable on final approval of the DIP Facility. |
| **Interest Payments** | Monthly, in arrears, on the drawn amount.  Any unpaid accrued interest will be payable upon maturity. |
| **Maturity** | Nine months from approval of the Interim DIP Motion |

26.     The Debtors will use the proceeds from the DIP Facility to address deferred maintenance needs, provide working capital for ongoing operations and fund administrative expenses during the course of these cases.  The Debtors' cash flow budget for the next 13 weeks is included in Exhibit 1.

**B.  Pre-petition wages**

27.     The Debtors have reduced the number of employees to a core group.  This core group is essential to efficiently liquidate the Debtors' assets.  The core group of employees include: the Chief Operating Officer, the General Manager, two bookkeepers, a Chinese translator/analyst and a geologist.  In addition, there is a contract controller on staff and a contract lease manager available as needed (collectively "Employees").  In conjunction with the filing, the CEO will be stepping down and serve in  a consulting role.  A list of the employees' titles, their compensation, and the amount owed as of the filing date is attached to the Employee Obligations Motion. We will continue to find ways to reduce the staff as operations are curtailed.

28.     Continued service by the Debtors' employees is vital to the Debtors' successful asset sale and the Debtors' ability to address issues related to untangling the complex series of intercompany transactions.  All of the Debtors' remaining employees have skills and specialized knowledge that are critical to the Debtors' sale.  While the Debtors could try to replace these individuals or conduct a sale without them, it would take

time, money, and likely delay the efforts to maximize hydrocarbon production and the value realized in an auction.

29.     Many of the Debtors' employees simply cannot afford to miss a paycheck and any disruption in pay will most certainly result in some employees seeking employment elsewhere.  Accordingly, it is absolutely critical to the Debtors' efforts that the Debtors maintain their employees and continue to compensate their employees in the ordinary course.  Accordingly, the Debtors seek authority to honor the various categories of employee obligations including employee compensation and payroll taxes, accrued vacation pay plans, outstanding expense reimbursements and health care benefits.

## C.  CRO appointment

30.     I wish to become the CRO for all Luca entities for the bankruptcy process.  I am an expert in oil and gas and have served as a court appointed trustee in several matters.  I have been involved with preparing the company for bankruptcy, obtaining the financing and stabilizing the operations.  I have gained the trust of the employees, Ms. Yang respects my judgment and I have spoken to the SEC about this bankruptcy.  I believe that I am the best person to execute this plan and maximize recoveries for the creditors and investors in Luca entities.

## D.  Application to employ Hoover Slovacek LLP

31.     I wish to employ Hoover Slovacek as my counsel in this manner.  The firm has been engaged in this matter for the last three weeks and they are well versed in the plan for the companies and the matters at hand.  Edward Rothberg will be the lead counsel, and Edward is well versed in oil and gas law.

**E.  Motions to reject leases**

> 32.     The Debtor LUCA International Group (Texas) LLC is currently the obligor on one
> real estate lease, and Debtor LUCA Operation, LLC is currently the obligor on two car
> leases.  The Luca Entities will not need the assets covered by the leases as the Debtors
> move forward with the sale process.  In an attempt to minimize expenses these leases
> will be rejected at the start of the case.

**F.  Motion for order authorizing maintenance of bank accounts, continued use of existing business forms etc.**

33.     The Debtors maintain the following bank accounts:

| Company | Bank | Account Type | Account # |
|---|---|---|---|
| Luca International Group LLC | Bank of America | Savings | ***0257 |
| Luca International Group LLC | Bank of America | Checking | ***7997 |
| Luca Operation LLC | Wells Fargo | Checking | ****2609 |
| Luca Operation LLC | Wells Fargo | Checking | ****1578 |
| Luca Operation LLC | Wells Fargo | Checking | ****9174 |
| Luca Operation LLC | Wells Fargo | CD, P&A reserve | ***2604 |
| Luca I LP | Wells Fargo | Checking | ******5415 |
| Luca I LP | EW Bank | Checking | ******3152 |
| Luca I LP | EW Bank | Checking | ******4799 |
| Luca Barnett Shale JV LLC | Wells Fargo | Checking | ******3699 |
| Luca Energy Fund LLC | Wells Fargo | Checking | ******3673 |
| Luca Resources Group LLC | Wells Fargo | Checking | ******7138 |

| Luca Oil II JV | Wells Fargo | Checking | ******3089 |
| Luca Oil II JV | Wells Fargo | Checking | ******6869 |

34.     The Debtors' cash management system is designed to permit the efficient collection and application of funds. The Debtors seek permission to continue their existing cash management system, without opening new debtor-in-possession bank accounts (except to the extent that the Debtors elect to do so in the ordinary course of their businesses).  A list of the Debtors' current bank accounts is attached to the Bank Account Motion. The Debtors also seek relief from any requirement that they open new sets of books and records.

35.     Permitting the Debtors to maintain their existing bank accounts and existing cash management system (or to make only such changes as are appropriate in the ordinary course of business) will prevent disruption of the Debtors' operations and will not prejudice any party in interest.  The Debtors' existing cash management accounts function smoothly and permit the efficient collection of cash for the benefit of the Debtors and all parties in interest.  Any requirement that the Debtors open new accounts would potentially result in confusion and delays and hinder the efficient use of the Debtors' resources.

36.     The Debtors also seek a waiver of the requirement in the United States Trustee's "Operating Guidelines and Reporting Requirements for Chapter 11 Cases" (the "Trustee's Guidelines") that they open new sets of books and records as of the Petition Date.  The Debtors submit that compliance with this requirement would create unnecessary administrative burdens.  The Debtors have in place computerized record

keeping systems and will be able to differentiate between pre-petition and post-petition transactions.

37. The relief requested in the Bank Account Motion is necessary to preserve business continuity and to lessen the likelihood of disruption to the Debtors' operations. Requiring the Debtors to implement: (a) new bank accounts; (b) a new cash management system; and (c) the use of new business forms, books and records would place an undue burden on the Debtors and their estates.

## G. Interim fee procedures

38. Debtors request that the Court approve a procedure for compensating professionals on a monthly basis, comparable to those established in other Chapter 11 cases. Debtors' proposed procedure will allow the Court and all other parties to more effectively monitor the fees and expenses incurred in this case.

39. The proposed procedure would require the presentation to Debtors and their counsel, the United States Trustee, the secured lender and its counsel of a detailed statement of services rendered and expenses incurred by each professional for the prior month. If no timely objection is made, Debtors' would be authorized to pay eighty percent (80%) of the amount of fees incurred for the month and one hundred percent (100%) of expense disbursements for the month. All payments would be subject to the Court's subsequent approval as part of the normal fee application process.

40. Specifically, Debtors propose that the following procedure for the interim compensation of the professionals be established in this case:

41. On or before the 25th day of each month following the month for which compensation is sought, each professional shall submit a monthly statement to (i) Debtors and its

counsel, (ii) Secured Creditors Debtors' Lenders and its counsel, and (iii) the United States Trustee (collectively the "Reviewing Parties"). The monthly statement shall identify the person performing services, the service performed, and the amount of time required to provide the service. All time shall be kept in one-tenth of an hour increments. The monthly statements shall contain a summary of the total time spent and compensation requested for each professional and paraprofessional. Each such entity receiving such a statement will have fourteen (14) days after its receipt to review and object to such statement. At the expiration of the fourteen (14) day period, Debtors will promptly pay eighty percent (80%) of the fees and one hundred percent (100%) of the expense disbursements requested in such statement, except such fees or expense disbursements to which an objection is made.

42.     In the event that any party objects to the compensation or reimbursement sought in a particular statement, such party shall, within fourteen (14) days of the receipt of the statement, serve upon (i) the professional whose statement is objected to, and (ii) except to the extent duplicative of the foregoing clause (i) the other persons designated to receive statements in paragraph (a) above, a written "Notice of Objection to Fee Statement," with an affidavit setting forth the precise nature of the objection and the amount at issue. Thereafter, the objecting party and the professional whose statement is objected to shall attempt to reach an agreement regarding the correct payment to be made. If the parties are unable to reach an agreement on the objection within fourteen (14) days after receipt of such objection, the professional whose fee statement is objected to shall have the option of (1) filing the objection together with a request for payment of the disputed amount with the Court, or (2) foregoing payment of the

disputed amount until the next interim fee application hearing, at which time the Court will consider and dispose of the objection if payment of the disputed amount is requested.  Debtors will promptly pay that percentage set forth above of any portion of the fees and disbursements requested that are not the subject of a Notice of Objection to Fee Statement.

43.      Every four months, each professional shall file with the Court an application for interim Court approval and allowance of the compensation and reimbursement of expenses requested for the prior four months. The first such application shall be filed on or before December 25, 2015, and shall cover the period from August 6, 2015 through November 30, 2015.  Any professional who fails to file an application when due shall be ineligible to receive further interim payments of fees or expenses until such time as the delinquent application is submitted.

44.      The pendency of an objection to payment of compensation or reimbursement of expenses shall not disqualify a professional from future compensation or reimbursement of expenses as set forth as set forth above.

45.      Neither the payment of, nor the failure to pay, in whole or in part, monthly interim compensation and reimbursement as provided herein shall bind any party-in-interest or the Court with respect to the allowance of applications for compensation and reimbursement of professionals.

46.      Debtors shall include all payments to professionals on the monthly operating reports.


**H.  Critical vendor motion**

47.    The vendors described in the Critical Vendor Motion each provide essential goods or services to the Debtors.  Replacing these critical vendors would take time, lead to inefficiencies as the replacement providers develop familiarity with the equipment at each well, and increase the cost of operating the wells.  Many of the vendors discussed below provide safety and environmental services, the loss of which could expose the Debtors to significant remediation liability and compliance costs.

48.    In addition, the Debtors' well-known financial and operational difficulties has severely limited the number of vendors who are willing to work with the Debtors.  While alternative suppliers may exist, the time required to identify them and negotiate payment terms will limit the Debtors' ability to make repairs and necessary maintenance by introducing delays into a time-sensitive process.

49.    I believe that making modest, good faith payments to the Critical Vendor will induce them to continue providing services to the Debtors during the course of these cases.  The Debtors are not asking for full payment of outstanding amounts.  The total amount requested by the Critical Vendor Motion is $105,170.04 or 33% of the total estimated amount owed to these Critical Vendors.  The following table summarizes the estimated total amount due to each Critical Vendor, the requested amount and the ratio of requested amount to estimated total amount due.

| Critical Vendors | | | |
|---|---|---|---|
| Vendor | Est. Amount Due | Proposed Payment | *% of Est.* |
| Coastal Chemical Co. LLC | $    2,181.01 | $    2,181.01 | 100% |
| Core Laboratories, LP | 4,167.00 | 4,167.00 | 100% |
| DNOW L.P. | 9,108.17 | 9,108.17 | 100% |
| F.A.S. Environmental Services, LLC | 56,014.00 | 41,912.00 | 75% |
| Global Logistics, LLC | 14,175.95 | 10,000.00 | 71% |
| Gustavson Associates, LLC | 20,035.75 | 20,035.75 | 100% |
| Ingo Energy, LLC | 5,031.00 | 5,031.00 | 100% |
| Ingo Gauging Services, LLC | 30,855.62 | 30,855.62 | 100% |
| K-J Company, Inc. | 2,000.00 | 2,000.00 | 100% |
| Ranger Specialty & Supply | 651.42 | 651.42 | 100% |
| Ric Bajon & Associates, LLC | 172,535.99 | 88,000.00 | 51% |
| | $316,755.91 | $213,941.97 | 68% |

50.     **Coastal Chemical Co. LLC** provides oilfield chemicals analysis and supplies to the
Debtors.  Coastal Chemical provides analysis of the bacteria and other contaminants in
water produced by each well.   Using this analysis, Coastal Chemical develops a
treatment program for the water that complies with environmental regulations and
minimizes the growth of bacteria.   Bacteria can clog disposal wells and limit the
Debtors' ability to dispose of water as it is produced.   The Debtors have a limited
amount of storage for produced water and could be forced to shut in the producing
wells without an efficiently operating disposal well.

51.     **Core Laboratories, LP** provides storage of valuable gas and condensate
samples from the Debtors' wells.  Core Laboratories is the sole provider of
secure, high pressure storage for flammable fluids and gases. In addition, these
sample are used for production tests, reservoir analysis and will be used in the
Debtor's planned asset marketing efforts.  The Debtors are at risk of Core
Laboratories disposing of the samples unless a payment is released.

52.     **DNOW LP** provides oil field parts and services critical to the maintenance of the wells.  Lost production time leads directly to lost production and lost revenue.  Furthermore, it is the closest large, diverse source of needed parts.  Switching to an alternative vendor would increase delivery times and transportation costs.

53.     **FAS Environmental** is a critical supplier of emergency response services as well as water hauling and disposal services.  The long-standing relationship with FAS Environmental, coupled with their willingness to work with Luca despite a poor credit rating, make replacing them extremely difficult.  The Debtors believe it would be very difficult to contract with another company that provides "first responder" services given the Debtors' reputation in the marketplace.  In addition, FAS Environmental owns a nearby water disposal well that the Debtors have used when the Acosta well is out of service.  Other third party water disposal sites are farther away and have higher transportation costs.

54.     **Global Logistics, L.L.C.** provides environmental and regulatory consultants who advise, assistance, and offer guidance about complying with local, state, and national environmental regulations. Global Logistics also handles necessary reporting to local, state, and national environmental entities.  This vendor has an extensive background with knowledge of the company that makes them expensive to replace.

55.     **Gustavson Associates** prepares the annual, independent, reserves report.  Replacing this vendor with another reserve engineering firm would lead to unnecessary duplication of well analyses and modeling.  The Debtors will save money by paying the pre-petition invoice for services related to drafting the

March reserve report and engaging Gustavson to update the report with current information. An alternative firm would require several weeks to develop an understanding of the wells and reserves before beginning to prepare an estimate of the value. The Debtors intend to begin marketing the properties as soon as a revised report is complete. Any delays will lead to higher, burdensome, administrative expenses.

56.     **Ingo Energy, LLC** and **Ingo Gauging Services** provide water hauling services critical to production and pumping and gauging services necessary for production at wells. Ingo has years of familiarity with the properties and a deep understanding of the mechanical systems in place. Replacing this vendor would require the new vendor to spend a considerable amount of time developing a familiarity with the systems and lead to higher costs for the Debtors. Gary Ingo is one of the Debtors' emergency contacts and is available to respond to and alleviate emergency situations in the field.

57.     **K-J Company, Inc.** serves as regulatory/compliance consultants, as well as file necessary reporting with the appropriate government bodies in order to continue production. This vendor's deep familiarity with the Debtors and properties makes replacing K-J Company a long, expensive process.

58.     **Ranger Specialty** provides a satellite-linked alarm system essential to the safe and proper operations of the Debtors' wells. The Debtors do not have an employee in the field and require remote monitoring of the production systems. Ranger Specialty's system monitors well pressures, oil levels in the storage tanks, and provides fire detection. In the event of an incident, the system

immediately alerts Dale Weatherbee, the Debtors' Chief Operating Officer, and Gary Ingo of Ingo Energy and Ingo Gauging, among others, so that the Debtors can prepare a response.  Prompt responses to leaks or pressure changes in the wells will minimize the likelihood of accidents and reduce or limit remediation costs.  Ranger Specialty's sensors are an integral part of the production equipment and replacing this system would be an unnecessary burden on the estate.

59.     **Ric Bajon & Associates, LLC** provides leasing and land services. The company possesses extensive on-the-ground, local experience, and their familiarity with properties, assets, and leases is critical to completing the water disposal well operating agreements.  This firm is a familiar middleman between the landowners and the Debtors.  Replacing them would require a new landman to develop relationships with each of the 28 different parties involved in the disposal well agreements, delaying completion of this important contract and requiring the Debtors' to continue using trucks to haul sate water to third party disposal sites.  In addition, Ric Bajon and Associates are in the process of recording several signed leases.  Unless the leases are recorded in the appropriate parish clerk's records, the Debtors will be unable to transfer the leases as part of the intended asset sale.

## I.   Joint administration

60.     The Debtors seek the joint administration of these chapter 11 cases for procedural purposes only pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

Joint administration is proper due to the ownership structure of the Debtors. The Debtors share common ownership by Ms. Yang.

61.     The Debtors intend to file with the Court numerous motions and applications, including the various motions and applications which have been filed on the first day of these bankruptcy cases. Entry of an order directing joint administration of these cases will eliminate unnecessary delay and expense of duplicative motions, applications and notices. Finally, this Court will be relieved of the burden of entering duplicative orders and maintaining duplicative files by jointly administering the bankruptcy cases.

62.     The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these cases. The relief sought is purely procedural and is in no way intended to affect substantive rights.

## J.  Notice of designation as complex chapter 11

63.     The Debtors request that these bankruptcy cases be treated as complex chapter 11 cases pursuant to General Order 2009-2. Pursuant to the Court's requirements, these cases qualify as complex Chapter 11 cases because there is a need for emergency consideration of the First Day Pleadings, the Debtors have debts in excess of $10,000,000, and there are a large number of parties in these cases. The Debtors request that the Court enter an order granting these cases complex chapter 11 case treatment.

Further affiant sayeth not".

_____
LORETTA R. CROSS

SUBSCRIBED AND SWORN TO BEFORE ME, on this $\underline{6^{th}}$ day of August, 2015.

SONIA NAIOMI RODRIGUEZ
My Commission Expires
May 27, 2016

_____
NOTARY PUBLIC, STATE OF TEXAS