**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | **CHAPTER 11** |
| | § | |
| **LUCA INTERNATIONAL GROUP** | § | **CASE NO. 15-34221-H2-11** |
| **LLC**[1] | § | |
| Debtors. | § | **JOINTLY ADMINISTERED** |

## NOTICE OF FILING OF ANNEX 1 TO FORM OF BID PROCEDURES ORDER
### [RELATES TO DOCKET #201]

Luca International Group LLC and its affiliated debtors and debtors in possession (collectively "Luca" or "Debtors"), Debtors in these jointly administered Chapter 11 cases, hereby file the Form Asset Purchase Agreement related to the Motion of Debtors for Order (1) Approving Bidding Procedures in Advance of Auction, (2) Authorizing the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases, (3) Approving Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (4) Setting Related Deadlines and Hearings and (5) Granting Related Relief [Docket #201] with the attached Form Asset Purchase Agreement to be included as Annex 1 to the Form of Bid Procedures Order.

DATED:      October 15, 2015

---

1 The Debtors in these cases, along with the last four digits of their respective taxpayer ID numbers, are Luca International Group LLC (1086), Luca International Group (Texas) LLC (5577), Luca Operation, LLC (0343), Luca Barnet Shale Joint Venture, LLC (5340), Luca Energy Fund LLC (0677), Luca Energy Resources, LLC (3896), Luca Resources Group, LLC (1699), Luca I, LP (4104), Luca II, LP, (9778), Luca Oil, LLC (8161), Luca To-Kalon Energy LLC (3922), Luca Oil II Joint Venture (6604).

Respectfully submitted,

HOOVER SLOVACEK LLP

By:    /s/ T. Josh Judd
        EDWARD L. ROTHBERG
        State Bar No. 17313990
        T. JOSH JUDD
        State Bar No. 24036866
        BRENDETTA A. SCOTT
        State Bar No.
        5051 Westheimer, Suite 1200
        Galleria Tower II
        Houston, Texas 77056
        Telephone: 713.977.8686
        Facsimile:  713.977.5395
ATTORNEYS FOR DEBTORS


## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2015, a true and correct copy of the foregoing Notice of Filing of Annex 1 has been served via the Court's ECF notification system by electronic mail to the parties listed below.

        /s/ T. Josh Judd
        T. JOSH JUDD

**15-34221 Notice will be electronically mailed to:**

Brandon Augustus Brown on behalf of Creditor Belle Grove Industrial Park, Inc.
bbrown@stewartrobbins.com, kheard@stewartrobbins.com

Brandon Augustus Brown on behalf of Creditor Belle Grove Plantation, LLC
bbrown@stewartrobbins.com, kheard@stewartrobbins.com

Sonia Anne Chae on behalf of Creditor Sonia Chae U.S. Securities & Exchange Commission
chaes@sec.gov, chaes@sec.gov

John Chu on behalf of Creditor Bingqing Yang
jchu149@yahoo.com

Hector Duran on behalf of U.S. Trustee US Trustee
Hector.Duran.Jr@usdoj.gov

Philip G Eisenberg on behalf of Creditor Committee Official Committee of Equity Securities
Holders
peisenberg@lockelord.com

Steven William Golden on behalf of Creditor Committee Official Committee of Equity
Securities Holders
steven.golden@lockelord.com

Tara L Grundemeier on behalf of Creditor Harris County
houston_bankruptcy@publicans.com

Elizabeth M Guffy on behalf of Creditor Committee Official Committee of Equity Securities
Holders
eguffy@lockelord.com, eguffy@ecf.epiqsystems.com

Joseph Patrick Hebert on behalf of Creditor Select Oilfield Services, LLC
jphebert@liskow.com, cguidry@liskow.com

T. Josh Judd on behalf of Debtor Luca Barnet Shale Joint Venture, LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Debtor Luca Energy Fund LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Debtor Luca Energy Resources, LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Debtor Luca I, LP
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Debtor Luca II, LP
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Debtor Luca International Group (Texas) LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Debtor Luca International Group LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Debtor Luca Oil II Joint Venture
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Debtor Luca Oil, LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Debtor Luca Operation, LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Debtor Luca Resources Group, LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Debtor Luca To-Kalon Energy, LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Joint Debtor Luca Barnet Shale Joint Venture, LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Joint Debtor Luca Energy Fund LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Joint Debtor Luca Energy Resources, LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Joint Debtor Luca I, LP
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Joint Debtor Luca II, LP
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Joint Debtor Luca International Group (Texas) LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Joint Debtor Luca Oil II Joint Venture
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Joint Debtor Luca Oil, LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Joint Debtor Luca Operation, LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Joint Debtor Luca Resources Group, LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

T. Josh Judd on behalf of Joint Debtor Luca To-Kalon Energy, LLC
judd@hooverslovacek.com,
bankruptcy1@hooverslovacek.com,mayle@hooverslovacek.com,welborn@hooverslovacek.com

Don J. Knabeschuh on behalf of Creditor Collarini Energy Staffing Inc
b50martinez@gmail.com

George A. Kurisky, Jr. on behalf of Creditor Hawkeye Stratigraphic, Inc.
gkurisky@jdkklaw.com,
kgoodman@jdkklaw.com;bsheppard@jdkklaw.com;twhite@jdkglaw.com;ttribble@jdkglaw.com

Steven A. Leyh on behalf of Creditor Ric Rabon & Associates, LLC
sleyh@lpmfirm.com, khaley@lpmfirm.com;lpm.ecf@gmail.com;aaguilar@lpmfirm.com

Charles E Long on behalf of Creditor Bing Yang
clong@cagehill.com, cagehill@cagehill.com

Simon Richard Mayer on behalf of Creditor Polycomp Trust Company FBO Ira J. Boren
srmayer@hwa.com, scastillo@hwa.com

Curtis W McCreight on behalf of Debtor Luca International Group LLC
mccreight@hooverslovacek.com, bankruptcy1@hooverslovacek.com

Curtis W McCreight on behalf of Joint Debtor Luca Barnet Shale Joint Venture, LLC
mccreight@hooverslovacek.com, bankruptcy1@hooverslovacek.com

Curtis W McCreight on behalf of Joint Debtor Luca Energy Fund LLC
mccreight@hooverslovacek.com, bankruptcy1@hooverslovacek.com

Curtis W McCreight on behalf of Joint Debtor Luca Energy Resources, LLC
mccreight@hooverslovacek.com, bankruptcy1@hooverslovacek.com

Curtis W McCreight on behalf of Joint Debtor Luca I, LP
mccreight@hooverslovacek.com, bankruptcy1@hooverslovacek.com

Curtis W McCreight on behalf of Joint Debtor Luca II, LP
mccreight@hooverslovacek.com, bankruptcy1@hooverslovacek.com

Curtis W McCreight on behalf of Joint Debtor Luca International Group (Texas) LLC
mccreight@hooverslovacek.com, bankruptcy1@hooverslovacek.com

Curtis W McCreight on behalf of Joint Debtor Luca Oil II Joint Venture
mccreight@hooverslovacek.com, bankruptcy1@hooverslovacek.com

Curtis W McCreight on behalf of Joint Debtor Luca Oil, LLC
mccreight@hooverslovacek.com, bankruptcy1@hooverslovacek.com

Curtis W McCreight on behalf of Joint Debtor Luca Operation, LLC
mccreight@hooverslovacek.com, bankruptcy1@hooverslovacek.com

Curtis W McCreight on behalf of Joint Debtor Luca Resources Group, LLC
mccreight@hooverslovacek.com, bankruptcy1@hooverslovacek.com

Curtis W McCreight on behalf of Joint Debtor Luca To-Kalon Energy, LLC
mccreight@hooverslovacek.com, bankruptcy1@hooverslovacek.com

John P Melko on behalf of Interested Party Schumann/Steier Holdings, LLC
jmelko@gardere.com, koliver@gardere.com

John A Mouton, III on behalf of Creditor T & P Well Testers of Lafayette, Inc.
john@jmoutonlaw.com

John A Mouton, III on behalf of Interested Party T&P Well Testers of Lafayette, Inc.
john@jmoutonlaw.com

Michael Kevin Riordan on behalf of Interested Party Schumann/Steier Holdings, LLC
mriordan@gardere.com, koliver@gardere.com

Edward L Rothberg on behalf of Debtor Luca Barnet Shale Joint Venture, LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Debtor Luca Energy Fund LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Debtor Luca Energy Resources, LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Debtor Luca I, LP
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Debtor Luca II, LP
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Debtor Luca International Group (Texas) LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Debtor Luca International Group LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Debtor Luca Oil II Joint Venture
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Debtor Luca Oil, LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Debtor Luca Operation, LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Debtor Luca Resources Group, LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Debtor Luca To-Kalon Energy, LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Joint Debtor Luca Barnet Shale Joint Venture, LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Joint Debtor Luca Energy Fund LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Joint Debtor Luca Energy Resources, LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Joint Debtor Luca I, LP
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Joint Debtor Luca II, LP
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Joint Debtor Luca International Group (Texas) LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Joint Debtor Luca Oil II Joint Venture
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Joint Debtor Luca Oil, LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Joint Debtor Luca Operation, LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Joint Debtor Luca Resources Group, LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Edward L Rothberg on behalf of Joint Debtor Luca To-Kalon Energy, LLC
rothberg@hooverslovacek.com,
mayle@hooverslovacek.com,ELRbankruptcy@gmail.com,ray@hooverslovacek.com;hsllpbankr
uptcy@gmail.com

Joseph Peak Rovira on behalf of Creditor Texas Tower Limited
josephrovira@andrewskurth.com

Brendetta Anthony Scott on behalf of Debtor Luca Barnet Shale Joint Venture, LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Debtor Luca Energy Fund LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Debtor Luca Energy Resources, LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Debtor Luca I, LP
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Debtor Luca II, LP
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Debtor Luca International Group (Texas) LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Debtor Luca International Group LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Debtor Luca Oil II Joint Venture
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Debtor Luca Oil, LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Debtor Luca Operation, LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Debtor Luca Resources Group, LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Debtor Luca To-Kalon Energy, LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Joint Debtor Luca Barnet Shale Joint Venture, LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Joint Debtor Luca Energy Fund LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Joint Debtor Luca Energy Resources, LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Joint Debtor Luca I, LP
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Joint Debtor Luca II, LP
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Joint Debtor Luca International Group (Texas) LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Joint Debtor Luca Oil II Joint Venture
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Joint Debtor Luca Oil, LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Joint Debtor Luca Operation, LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Joint Debtor Luca Resources Group, LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Joint Debtor Luca To-Kalon Energy, LLC
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Brendetta Anthony Scott on behalf of Other Prof. BMC Group, Inc.
scott@hooverslovacek.com, rodriguez@hooverslovacek.com,bankruptcy1@hooverslovacek.com

Robert W St Clair on behalf of Creditor Guangxi Huashuo Investment Group
rstclair@lbklawyers.com, jchang@lbklawyers.com

US Trustee
USTPRegion07.HU.ECF@USDOJ.GOV

# ANNEX 1

Form Asset Purchase Agreement

# PURCHASE AND SALE AGREEMENT

BY AND BETWEEN


LUCA

INTERNATIONAL

GROUP, LLC AS

SELLER


AND


**[Buyer],**

AS BUYER


DATED [ _____, 2015]

**TABLE OF CONTENTS**

Page

ARTICLE I. DEFINITIONS ..................................................................................................... 1
    Section 1.01        Defined Terms ................................................................... 1
    Section 1.02        Interpretation..................................................................
ARTICLE II. ASSETS ............................................................................................................7
    Section 2.01        Agreement to Sell and Purchase ....................................7
    Section 2.02        Assets ...............................................................................8
    Section 2.03        Excluded and Reserved Assets .......................................9
    Section 2.04        Revenues and Expenses .................................................10
ARTICLE III. CONSIDERATION [10]
    Section 3.01        Purchase Price.................................................................
    Section 3.02        Earnest Money ...............................................................10
    Section 3.03        Allocated Values............................................................10
ARTICLE IV. CONSENTS; CASUALTIES ........................................................................11
    Section 4.01        Consents to Assign ........................................................11
    Section 4.02        Casualty or Condemnation Loss....................................12
ARTICLE V. REPRESENTATIONS AND WARRANTIES .................................................13
    Section 5.01        Representations and Warranties of Seller......................13
    Section 5.02        Representations and Warranties of Buyer .....................15
ARTICLE VI. CERTAIN COVENANTS
    Section 6.01        Confidentiality.................................................................
    Section 6.02        Dispositions of Assets
    Section 6.03        Operations
    Section 6.04        Governmental Bonds; Operator....................................18
    Section 6.05        Amendment of Schedules..............................................18
    Section 6.06        Bankruptcy Actions.........................................................
    Section 6.07        Reasonable Best Efforts .................................................18
ARTICLE VII. BANKRUPTCY MATTERS...........................................................................19
    Section 7.01        Auction and Bidding .....................................................19
    Section 7.02        Certain Contract Matters ...............................................19
    Section 7.03        Appeal
ARTICLE VIII. CONDITIONS TO CLOSING
    Section 8.01        Conditions to Seller's Obligations................................19
    Section 8.02        Conditions to Buyer's Obligations ...............................20

Section 8.03          Conditions to the Parties' Obligations ............................................20

Section 8.04          Closing Over Breaches or Unsatisfied Conditions ......................................21

Section 8.05          Frustration of Closing Conditions ................................................21

ARTICLE IX. CLOSING.................................................................................21

Section 9.01          Time and Place of Closing........................................................21

Section 9.02          Closing Statement; Adjustments to Purchase Price at Closing ..................21

Section 9.03          Actions of Seller at Closing.....................................................22

Section 9.04          Actions of Buyer at Closing .....................................................23

ARTICLE X. CERTAIN POST-CLOSING OBLIGATIONS....................................................23

Section 10.01         Operation of the Assets After Closing ......................................23

Section 10.02         Files.......................................................................23

Section 10.03         Financial Records and Access to Information

Section 10.04         Further Cooperation

Section 10.05         Document Retention

Section 10.06         Suspense Accounts

ARTICLE XI. TERMINATION

Section 11.01         Right of Termination

Section 11.02         Effect of Termination; Earnest Money

ARTICLE XII. ASSUMPTION AND INDEMNIFICATION

Section 12.01         Assumption and Indemnity

Section 12.02         Indemnification by Buyer

Section 12.03         Buyer's Environmental Indemnification ...................................... 26

Section 12.04         Negligence and Fault ................................................... 27

Section 12.05         Exclusive Remedy

Section 12.06         Expenses

Section 12.07         Survival ................................................................ 27

Section 12.08         Non-Compensatory Damages

Section 12.09         Indemnification Actions

Section 12.10         Characterization of Indemnity Payments......................................29

ARTICLE XIII. DISCLAIMERS OF REPRESENTATIONS AND WARRANTIES  29

ARTICLE XIV. MISCELLANEOUS

Section 14.01         Transfer Taxes

Section 14.02         Cooperation on Tax Returns and Tax Proceedings ......................................31

Section 14.03         Filings, Notices and Certain Governmental Approvals.................................31

Section 14.04         Entire Agreement ..........................................................31

Section 14.05    Waiver .................................................................................. 31

Section 14.06    Publicity ............................................................................... 31

Section 14.07    No Third Party Beneficiaries ................................................ 31

Section 14.08    Assignment ........................................................................... 31

Section 14.09    GOVERNING LAW; VENUE; WAIVER OF JURY TRIAL ..................... 32

Section 14.10    Notices ................................................................................. 32

Section 14.11    Severability

Section 14.12    Counterparts

Section 14.13    Approval of the Bankruptcy Court

Section 14.14    Amendment

Section 14.15    Schedules and Exhibits ........................................................ 33

Section 14.16    Time of the Essence

**EXHIBITS**

Exhibit A      Part 1      Leases

Exhibit A      Part 2      Wells/Allocated Values
Exhibit A      Part 3      Saltwater Disposal Leases]
Exhibit A      Part 4      Easements, Rights-of-Way, Surface Fees and Surface Leases
Exhibit A      Part 5      Field Offices]
Exhibit A      Part 6      Material Contracts


Exhibit B      -      Excluded Assets
Exhibit C      -      Form of Assignment
Exhibit D      -      Form of Escrow Agreement

**SCHEDULES**


Schedule 1.01           -   Knowledge

Schedule 5.01(c)        -   Consents
Schedule 5.01(e)        -   Noncontravention
Schedule 5.01(f)        -   Litigation
Schedule 5.01(g)        -   Brokers' Fees
Schedule 5.01(h)        -   Taxes
Schedule 5.01(i)        -   Royalty Payments
Schedule 5.01(j)        -   Hydrocarbon Sales
Schedule 5.01(k)        -   Environmental Notices
Schedule 5.01(l)        -   Compliance with Laws
Schedule 5.01(n)        -   AFEs
Schedule 5.01(o)        -   Preferential Purchase Rights
Schedule 5.01(p)        -   Imbalances
Schedule 5.02(c)        -   Consents
Schedule 6.03           -   Interim Period Operations

# PURCHASE AND SALE AGREEMENT

This **Purchase and Sale Agreement** (this **"Agreement"**) is made and entered into this___ day of [_____ ], by and between **Luca International Group, LLC,** a limited liability company] **("Seller"),** and **[Buyer],** a [_____ _____ ] **("Buyer").** Buyer and Seller are sometimes referred to herein, collectively, as the **"Parties"** and, individually, as a **"Party."**

## W I T N E S S E T H:

**WHEREAS,** on August 6, 2015, Seller filed a voluntary petition for relief (the **"Bankruptcy Case"**) under the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101 through 1532, as may have been or are amended from time to time (the **"Bankruptcy Code"**) before the United States Bankruptcy Court for the Southern District of Texas (the **"Bankruptcy Court");**

**WHEREAS,** Seller, as debtor and debtor-in-possession, has continued in the possession of the Assets (as defined hereinafter) and the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS,** Seller, subject to the receipt of any higher or better offer received by it, desires to sell and assign, and Buyer desires to purchase and acquire, all of Seller's right, title and interest in, to and under the Assets effective as of the Effective Time (as defined hereinafter); and

**WHEREAS,** the transactions contemplated hereunder are subject to the authorization and approval of the Bankruptcy Court.

**NOW, THEREFORE,** in consideration of the premises and of the mutual promises, representations, warranties, covenants, conditions and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each Party, the Parties agree as follows:

## ARTICLE I. DEFINITIONS

**Section 1.01 Defined Terms.** As used in this Agreement, the following terms shall have the meanings set forth below:

**"Adjusted Purchase Price"** shall have the meaning given that term in **Section 3.01.**

**"Advisors"** shall have the meaning given that term in **Section 6.01.**

**"AFEs"** shall have the meaning given that term in **Section 5.01(n).**

**"Affiliate"** shall mean any Person that, directly or indirectly, through one or more entities, controls, is controlled by or is under common control with the Person specified. For the purpose of the immediately preceding sentence, the term "control" and its syntactical variants mean the power, direct or indirect, to direct or cause the direction of the management of such Person, whether through the ownership of voting securities, by contract, agency or otherwise.

**"Agreement"** shall have the meaning given that term in the preamble.

**"Allocated Value"** shall have the meaning given that term in **Section 3.03.**

**"Alternative Transaction"** has the meaning given that term in **Section 11.01(e).**

**"Assets"** shall have the meaning given that term in **Section 2.02.**

**"Assignments"** shall have the meaning given that term in **Section 9.03(a).**

**"Assumed Obligations"** shall have the meaning given that term in **Section 12.01.**

**"Auction"** shall have the meaning given that term in **Section 7.01(a).**

**"Bankruptcy Case"** shall have the meaning given that term in the Recitals.

**"Bankruptcy Code"** shall have the meaning given that term in the Recitals.

**"Bankruptcy Court"** shall have the meaning given that term in the Recitals.

**"Bid"** shall have the meaning given that term in the Bidding Procedures.

**"Bidding Procedures"** shall have the meaning given that term in the Bidding Procedures Order.

**"Bidding Procedures Order"** shall mean the Order (A) Approving Sale and Bidding Procedures in Connection with Sale of Assets of the Debtors, (B) Approving Form and Manner of Notice, (C) Scheduling Auction and Sale Hearing, (D) Authorizing Procedures Governing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (E) Granting Related Relief, to be entered by the Bankruptcy Court.

**"Business Day"** shall mean any day other than a Saturday, a Sunday or a day on which banks in Houston, Texas are authorized or obligated by Law to close.

**"Buyer"** shall have the meaning given that term in the preamble.

**"Buyer Affiliates"** shall mean Buyer and its members, partners, shareholders and Affiliates, and the officers, board of directors and/or managers, employees, agents and representatives of all of the foregoing Persons.

**"Claim"** shall have the meaning given that term in **Section 12.09(b).**

**"Claim Notice"** shall have the meaning given that term in **Section 12.09(b).**

**"Closing"** shall have the meaning given that term in **Section 9.01.**

**"Closing Date"** shall have the meaning given that term in **Section 9.01.**

**"Closing Statement"** shall have the meaning given that term in **Section 9.02.**

**"Code"** shall mean the Internal Revenue Code of 1986, as amended and any successor statute thereto.

**"Consent"** shall have the meaning given that term in **Section 5.01(c).**

**"Consent Deductible"** shall have the meaning given that term in **Section 4.01(a).**

**"Consent Deposit Amount"** shall have the meaning given that term in **Section 4.01(a).**

**"Consent Threshold"** shall have the meaning given that term in **Section 4.01(a).**

**"Contract Cure Amount"** shall mean, with respect to any Contract, the amounts required to be paid, if any, in connection with the assumption and assignment of such Contract pursuant to Section 365 of the Bankruptcy Code.

**"Contracts"** shall have the meaning given that term in **Section 2.02(h).**

**"Dispute Notice"** shall have the meaning given that term in **Section 9.02(c).**

**"Earnest Money"** shall mean an amount equal to ten percent (10.0%) of the Purchase Price, deposited by Buyer into the Escrow Account and not refundable to Buyer unless explicitly provided in **Article XI.**

**"Effective Time"** shall mean 7:00 a.m. Houston, Texas time on the first day of the month immediately following the date in which the Bankruptcy Court issues the Sale Order.

**"Environmental Laws"** shall mean applicable federal, state and local Laws (in each case, as the same have been amended prior to the date of this Agreement) pertaining to the environment (including natural resources), the prevention of pollution, the remediation of contamination, or the restoration of environmental, including the Clean Air Act, the Clean Water Act, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Occupational Safety and Health Act of 1970, the Resource Conservation and Recovery Act of 1976, the Safe Drinking Water Act, the Toxic Substances Control Act and the Oil Pollution Act of 1990.

**"Escrow Account"** means an escrow account covered by the Escrow Agreement.

**"Escrow Agent"** means [_____ ].

**"Escrow Agreement"** means an Escrow Agreement substantially in the form of **Exhibit D** among the Escrow Agent, Seller and Buyer.

**"Excluded Assets"** shall have the meaning given that term in **Section 2.03.**

**"Facilities"** shall have the meaning given that term in **Section 2.02(d).**

**"Files"** shall have the meaning given that term in **Section 2.02(j).**

**"Final Accounting Statement"** shall have the meaning given that term in **Section 9.02(c).**

**"Final Order"** shall mean an order of the Bankruptcy Court as to which the time to appeal has expired and as to which no appeal, petition for certiorari, or other proceedings for reconsideration shall then be pending.

**"Financial Records"** shall mean, to the extent in Seller's possession, all available financial information relating to the Assets for the last two years, including, but not be limited to, all general ledgers, journals, revenue logs, operating reports, invoices and any other underlying supporting documents that may be needed to prepare audited and proforma financial statements of the Assets as a result of this transaction.

**"GAAP"** shall mean generally accepted accounting principles in the United States of America as in effect from time to time.

**"Governmental Authority"** shall mean any federal, state, local or foreign government or any court of competent jurisdiction, regulatory or administrative agency, commission or other governmental authority that exercises jurisdiction over any of the Assets.

**"Hazardous Substances"** shall mean any substance defined or regulated as a "hazardous substance" or "hazardous waste" under or otherwise regulated by any Environmental Laws.

**"Hydrocarbons"** shall mean oil and gas and other hydrocarbons produced or processed in association therewith.

**"Imbalance"** shall mean any imbalance at the wellhead between the amount of Hydrocarbons produced from a Well and allocable to the interests of Seller therein and the shares of production from the relevant Well to which Seller is entitled, together with any appurtenant rights and obligations concerning future in kind and/or cash balancing at the wellhead.

**"Income Taxes"** shall mean any income, capital gains, franchise and similar Taxes.

**"Indemnitee"** shall have the meaning given that term in **Section 12.09(a).**

**"Interim Period"** shall mean that period commencing on the date of the execution of this Agreement and terminating upon the earlier of the Closing or the termination of this Agreement.

**"Knowledge"** shall mean, with respect to Seller and Buyer, the actual knowledge of the Persons listed on **Schedule 1.01** hereto.

**"Law"** shall mean any applicable statute, law, rule, regulation, ordinance, order, code, ruling, writ, injunction, decree or other official act of or by any Governmental Authority.

**"Leases"** shall have the meaning given that term in **Section 2.02(a).**

**"Liabilities"** shall mean, except as provided in **Section 12.08,** any and all claims, causes of action, payments, charges, judgments, assessments, liabilities, losses, damages, penalties, fines or costs and expenses, including any attorneys' fees, legal or other expenses incurred in connection therewith and including liabilities, costs, losses and damages for personal injury or death or property damage or environmental damage or remediation.

**"Liens"** shall mean any mortgage, lien, security interest or other charge or encumbrance, or any financing lease having substantially the same economic effect as any of the foregoing.

**"Material Adverse Effect"** shall mean (a) any change, effect, state of facts, occurrence, event or circumstance that results, individually or in the aggregate, in a material adverse effect on the use, ownership or operation of the Assets, taken as a whole and as currently operated as of the date of this Agreement, or (b) any change, effect, state of facts, occurrence, event or circumstance that prevents or materially impedes the consummation by Seller of the transactions contemplated by this Agreement; provided, however, that no change, effect, state of facts, occurrence, event or circumstance, individually or in the aggregate, that arises or results from the following shall be deemed to constitute or be considered in determining whether a Material Adverse Effect has occurred: (i) changes in general economic, capital market, regulatory or political conditions or changes in applicable Law or the interpretation thereof that, in any case, do not materially disproportionately affect the Assets in any area or areas where the Assets are located as compared to similarly situated properties; (ii) changes that affect generally the oil and gas industry in any area or areas where the Assets are located that, in any case, do not materially disproportionately affect the Assets as compared to similarly situated properties; (iii) the declaration by the United States of a national emergency or acts of war or terrorism or acts of God that, in any case, do not materially disproportionately affect the Assets; (iv) the entry into or announcement of the transactions contemplated by this Agreement, or the consummation of the

transactions contemplated hereby, (vi) changes in Law or GAAP, (vii) any changes in commodity prices, including any Hydrocarbons or other commodities relating to the business of Seller or the Assets; (vii) any action or omission of Buyer; (viii) changes relating to or arising from (A) the filing, pendency or conduct of the Bankruptcy Case, (B) any orders of the Bankruptcy Court or (C) the fact that Seller is operating as a debtor-in-possession under the Bankruptcy Code; or (ix) any action or omission of Seller taken in accordance with the terms of this Agreement without the violation thereof or with the prior written consent of Buyer.

"**Material Contract**" shall mean the following (excluding any Leases) to the extent relating to the Assets and that would be binding upon Buyer after the consummation of the transactions contemplated hereby:

(a) any Contract that (i) can reasonably be expected to result in aggregate payments by Seller of more than [_____ Dollars ($     )] during the current or any subsequent fiscal year (based solely on the terms thereof and without regard to any expected increase in volumes or revenues) and (ii) cannot be terminated without penalty on [     (_)] days or less notice;

(b) any Contract that can reasonably be expected to result in aggregate revenues to Seller of more than [Dollars ($      )] during the current or any subsequent fiscal year (based solely on the terms thereof and without regard to any expected increase in volumes or revenues);

(c) any purchase and sale, transportation, processing, refining or similar Contract (in each case) to which Seller is a party or to which the Assets are subject to that is not terminable without penalty on [ ___(_)] days or less notice;

(d) any indenture, mortgage, loan, note, credit, sale-leaseback or similar Contract (in each case) to which any of the Assets are subject and all related security agreements or similar agreements associated therewith, unless such Assets are to be released from such Contracts on or before the Closing; and

(e) any Contract between an Affiliate of Seller, on the one hand, and Seller, on the other hand, that would be binding upon Buyer following Closing and will not be terminated on or prior to Closing.

"**NORM**" shall have the meaning given that term in **Section 5.02(k).**

"**Operating Expenses**" means all operating expenses (including costs of insurance and Production Taxes) and capital expenditures incurred in the ownership, operation or maintenance of the Assets and, where applicable, in accordance with the relevant operating or unit agreement, if any, and Overhead Costs charged or attributable to the Assets, but excluding (a) Liabilities for personal injury or death, property damage or violation of any Law, (b) obligations to plug Wells, dismantle Facilities, close pits or restore the surface around such Wells, Facilities and pits, (c) environmental Liabilities, including obligations to remediate any contamination of groundwater, surface water, soil, sediments, Facilities or personal property under applicable Environmental Laws, (d) obligations with respect to Imbalances, and (e) obligations to pay working interests, royalties, overriding royalties or other interest owners revenues or proceeds attributable to sales of Hydrocarbons relating to the Properties, including those held in suspense.

"**Outside Date**" shall mean [_____], 2015.

"**Overhead Costs**" shall mean, with respect to each Well, (a) the overhead amount under the joint operating agreement applicable to such Well that would be attributable to Seller's interest therein for the period of time from and after the Effective Time up to (and including) the Closing Date, or (b) if no such joint operating agreement is in existence with respect to any Well, then the amount obtained by multiplying

(i) [ Dollars ($             )] per day for such Well or (ii) the number of days elapsing from and after the Effective Time up to (and including) the Closing Date.

"**Parties**" shall have the meaning given that term in the preamble.

"**Person**" shall mean an individual, corporation, partnership, association, trust, limited liability company or any other entity or organization, including government or political subdivisions or an agency, unit or instrumentality thereof.

"**Petition Date**" shall have the meaning given that term in the Bidding Procedures Order.

"**Production Taxes**" means ad valorem, property, severance, production and similar Taxes based upon or measured by the ownership or operation of the Assets or the production of Hydrocarbons therefrom, but excluding, for the avoidance of doubt, (a) Income Taxes and (b) Transfer Taxes.

"**Properties**" shall have the meaning given that term in **Section 2.02(b).**

"**Purchase Price**" shall have the meaning given that term in **Section 3.01.**

"**Purchase Price Allocation**" shall have the meaning given that term in **Section 3.03.**

"**Qualified Bidder**" shall have the meaning given that term in the Bidding Procedures.

"**Royalties**" shall have the meaning given that term in **Section 5.01(i).**

"**Sale Order**" is an order of the Bankruptcy Court, acceptable to Seller and Buyer, entered pursuant to Sections 105, 363, and 365 of the Bankruptcy Code (a) approving this Agreement and the transactions contemplated hereby; (b) approving the sale and transfer of the Assets to Buyer free and clear of all Liens, claims and interests (other than Liens created by Buyer), pursuant to Section 363(f) of the Bankruptcy Code, (c) approving the assumption and assignment to Buyer of the Contracts; (d) finding that Buyer is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (e) finding that due and adequate notice of the Sale Motion and an opportunity to be heard were provided to all Persons entitled thereto, including but not limited to federal, state and local taxing and regulatory authorities; (f) confirming that Buyer is acquiring the Assets free and clear of all liabilities, other than the Assumed Obligations; and (g) providing that the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) are waived and there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure.

"**Seller**" shall have the meaning given that term in the preamble.

"**Seller Indemnitees**" shall mean Seller and its respective members, partners, shareholders, Affiliates, successors and assigns, and the officers, board of directors and/or managers, employees, agents, and representatives of all of the foregoing Persons.

"**Successful Bidder**" shall have the meaning given that term in the Bidding Procedures.

"**Tax Returns**" shall mean any report, return, information statement, payee statement or other information required to be provided to any Governmental Authority with respect to Taxes or any schedule or attachment thereto or any amendment thereof, including any return of an affiliated, combined or unitary group, and any and all work papers relating to any Tax Return.

"**Taxes**" means any taxes, assessments and other governmental charges imposed by any Governmental Authority, including net income, gross income, profits, gross receipts, license, employment, stamp, occupation, premium, alternative or add-on minimum, ad valorem, real property, personal property, transfer, real property transfer, value added, sales, use, environmental (including taxes under Code Section 59A), customs, duties, capital stock, franchise, excise, withholding, social security (or similar), unemployment, disability, payroll, fuel, excess profits, windfall profit, severance, estimated or other tax,

including any interest, penalty or addition thereto, whether disputed or not, and any reasonable expenses incurred in connection with the determination, settlement or litigation of the Tax liability.

**"Third Party"** shall mean any Person other than a Party to this Agreement or an Affiliate of a Party to this Agreement.

**"Transfer Taxes"** shall have the meaning given that term in **Section 14.01**.

**"Un-obtained Consent"** shall have the meaning given that term in **Section 4.01(a).**

**"Unit Interests"** shall have the meaning given that term in **Section 2.02(a).**

**"Wells"** shall have the meaning given that term in **Section 2.02(b).**

**Section 1.02 Interpretation.** As used in this Agreement, unless the context otherwise requires, the term "includes" and its syntactical variants means "includes but is not limited to." The headings and captions contained in this Agreement have been inserted for convenience only and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions hereof. Preparation of this Agreement has been a joint effort of the Parties and the resulting document shall not be construed more severely against one of the Parties than against the other. All references herein to "Sections" and "Articles" in this Agreement shall refer to the corresponding section and article of this Agreement unless specific reference is made to such sections of another document or instrument. The words "hereof," "herein" and "hereunder" and words of similar import when used in any agreement or instrument shall refer to such agreement or instrument as a whole and not to any particular provision of such agreement or instrument.

## ARTICLE II. ASSETS

**Section 2.01 Agreement to Sell and Purchase.** Pursuant to Section 363 and 365 of the Bankruptcy Code, for the consideration hereinafter set forth and subject to the terms and conditions of this Agreement, Buyer agrees to purchase from Seller, and Seller agrees to sell to Buyer, all of Seller's right, title and interest in and to the Assets.

**Section 2.02    Assets.** Subject to Section 2.03, the term "Assets" shall mean, less and except the Excluded Assets, all of Seller's right, title and interest in, to and under:

(a)        (i) the oil and gas leases described in **Exhibit A - Part 1** (Seller's interests in such leases, including all overriding royalty interests, collectively, the **"Leases"),** and (ii) the interests in any units or pooled or communitized lands arising on account of the Leases having been unitized or pooled into such units or with such lands (Seller's interests in such units, the **"Unit Interests");**

(b)        all existing (on or after the date of this Agreement but prior to Closing) wells on or attributable to the Leases or Unit Interests (Seller's interests in such wells, collectively and including the wells set forth on **Exhibit A—Part 2,** the **"Wells",** and the Leases, the Unit Interests and the Wells being collectively referred to hereinafter as the **"Properties");**

(c)        [all surface fee and leaseholds, including all saltwater disposal leases described in **Exhibit A—Part 3** and all saltwater disposal wells located on such saltwater disposal leases, the Leases and Unit Interests;]

(d)        all production facilities, structures, tubular goods, well equipment, lease equipment, production equipment, pipelines, inventory and all other personal property, fixtures and facilities to the extent appurtenant to or used solely in connection with the Properties (collectively, the **"Facilities");**

(e)        to the extent assignable at no cost to Seller, all permits, licenses, servitudes, easements, rights-of-way, surface fee interests and other surface use agreements to the extent used in connection with the ownership or operation of the Properties or the Facilities, including those described in **Exhibit A-Part 4;**

[the offices described on **Exhibit A - Part 5**, including the computers, furniture and other personal property located therein, and the lands and leases associated therewith, including those described in **Exhibit A - Part 5**;]

(g)     the Hydrocarbons produced from or attributable to the Properties from and after the Effective Time and all Hydrocarbons produced therefrom prior to the Effective Time that are (i) in storage to the bottom of the flange prior to sale and (ii) upstream of the sales metering point as of the Closing Date;

(h)     to the extent assignable at no cost to Seller, all contracts and agreements related solely to the Properties, including the contracts and agreements listed in **Exhibit A - Part 6** (collectively, the **"Contracts"**);

(i)     all Imbalances relating to the Properties; and

(j)     to the extent assignable at no cost to Seller, all of those records, files, contracts, orders, agreements, permits, licenses, easements, maps, data, schedules, reports and logs relating to the Assets (collectively referred to as the **"Files"**);

**Section 2.03 Excluded and Reserved Assets.** The Assets shall not include, and there is excepted, reserved and excluded from the purchase and sale contemplated hereby, the Excluded Assets. The "Excluded Assets" shall mean:

(a)     any trade credits, accounts receivable, proceeds or revenues attributable to the Assets and accruing prior to the Effective Time;

(b)     all Hydrocarbons produced from or attributable to the Properties with respect to any periods of time prior to the Effective Time that are not (i) in storage to the bottom of the flange prior to sale and (ii) upstream of the sales metering point as of the Closing Date, and all proceeds attributable thereto;

(c)     all refunds of costs, Production Taxes or expenses attributable to any periods of time prior to the Effective Time, and all refunds, credits, net operating losses and similar Tax assets attributable to Income Taxes imposed on Seller, its Affiliates and/or its direct and indirect owners;

(d)     all proceeds from the settlements of contract disputes with purchasers of Hydrocarbons from or attributable to the Properties, insofar as said proceeds are attributable to any periods of time prior to the Effective Time;

(e)     all guarantees, letters of credit, comfort letters, surety bonds, support agreements and other credit support and any cash or cash equivalents or other security or collateral provided therefor by Seller or Seller's Affiliates in support of the obligations of Seller with respect to the Assets;

(f)     subject to **Section 4.02,** all rights, titles, claims and interests of Seller or its Affiliates under any insurance policy or agreement, to any insurance proceeds or to or under any bond or bond proceeds, in each such case attributable to acts, events or occurrences prior to the Effective Time;

(g)     all rights and claims, asserted or unasserted, contingent or fixed, known or unknown, relating to the Assets and attributable to periods of time prior to the Effective Time;

(h)     all patents, patent applications, logos, service marks, copyrights, trade names or trademarks of or associated with Seller, its Affiliates or their businesses;

(i)     all privileged attorney-client (i) communications and (ii) other documents (other than title opinions);

(j)    all materials and information that cannot be disclosed to Buyer as a result of confidentiality obligations to Third Parties;

(k)    all audit rights arising under any of the Contracts with respect to any periods of time prior to the Effective Time or to any of the Excluded Assets, except for any Imbalances;

(l)    all valuations, bidder lists, presentations and communications with marketing advisors developed or prepared in connection with marketing the Assets;

(m)   all amounts paid by any Person to Seller or its Affiliates as overhead for periods of time accruing prior to the Effective Time under any joint operating agreements burdening the Assets;

(n)    all master service agreements between Seller and any Third Party and all rights and privileges thereunder;

(o)    all corporate, financial, income and franchise tax and litigation records that relate to Seller's business generally, materials, analyses and information developed or prepared in connection with marketing the Assets and all books and records related to the Excluded Assets and copies of the Files retained by Seller; and

(p)    except as otherwise expressly provided in this Agreement, all cash and cash equivalents (including marketable securities and short-term investments).

**Section 2.04 Revenues and Expenses.** Subject to the provisions hereof, including Section 9.02(a)(iii) and Section 12.01, Seller shall remain entitled to all of the rights of ownership (including the right to all production, proceeds of production and other proceeds) and shall remain responsible for all Operating Expenses (in each case) attributable to the Assets for the period of time prior to the Effective Time. Subject to the provisions hereof, from and after Closing, Buyer shall be entitled to all of the rights of ownership (including the right to all production, proceeds of production and other proceeds) and shall be responsible for all Operating Expenses (in each case) attributable to the Assets for the period of time from and after the Effective Time. All Operating Expenses attributable to the Assets (in each case) that are: (a) incurred with respect to operations conducted or Hydrocarbons produced prior to the Effective Time shall be paid by or allocated to Seller and (b) incurred with respect to operations conducted or Hydrocarbons produced from and after the Effective Time shall be paid by or allocated to Buyer. Seller shall, upon receipt of any amounts owed to Buyer under this Section 2.04 that are not accounted for in the Final Accounting Statement, promptly deliver any such amounts to Buyer. Buyer shall, upon its receipt of any amounts owed to Seller under this Section 2.04 that are not accounted for in the Final Accounting Statement, promptly deliver any such amounts to Seller.

# ARTICLE III. CONSIDERATION

**Section 3.01   Purchase Price.** The consideration for the purchase, sale and assignment of the Assets by Seller to Buyer is Buyer's payment to Seller of the sum of [ _____ DOLLARS   AND 00/100 ($ _____ .00)](the "Purchase Price"), as adjusted pursuant to Section 9.02 and less the Earnest Money (the "Adjusted Purchase Price"). The Adjusted Purchase Price shall be paid by Buyer to Seller at the Closing by means of a completed wire transfer in immediately available funds to the account of Seller as designated by Seller to Buyer in writing prior to the Closing.

**Section 3.02 Earnest Money.** Upon the execution hereof, Buyer and Seller shall enter into the Escrow Agreement with the Escrow Agent and Buyer shall deposit the Earnest Money into the Escrow Account. All fees and expenses of the Escrow Account and Escrow Agent shall be borne one-half by Seller and one-half by Buyer. If Closing occurs, the Earnest Money shall be disbursed to Seller as a portion of the

Purchase Price, otherwise the Earnest Money shall be disbursed pursuant to and in accordance with the terms of this Agreement.

**Section 3.03 Allocated Values.** Buyer and Seller agree that the unadjusted Purchase Price is allocated among the Assets in the amounts set forth in Exhibit A—Part 2 (the "Purchase Price Allocation"). The "Allocated Value" for any Asset equals the portion of the Purchase Price allocated to such Asset on Exhibit A—Part 2 and such Allocated Value shall be used in calculating adjustments to the Purchase Price as provided herein. Buyer and Seller shall use commercially reasonable efforts to update the Purchase Price Allocation in a manner consistent with the prior Purchase Price Allocation following any adjustment to the Purchase Price pursuant to this Agreement. Buyer and Seller agree that (a) the Purchase Price Allocation (as adjusted) shall be used by Seller and Buyer as the basis for reporting Asset values and other items for purposes of all federal, state and local income Tax Returns, including without limitation Internal Revenue Service Form 8594, which Buyer and Seller shall timely file with the Internal Revenue Service and (b) neither they nor their Affiliates will take positions inconsistent with the Purchase Price Allocation or Allocated Values (as each is adjusted) in notices to Governmental Authorities, in audit or other proceedings with respect to Taxes, in notices to preferential purchase right holders or in other documents or notices relating to the transactions contemplated by this Agreement; provided, however, that neither Party shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, claim or similar proceedings.

## ARTICLE IV. CONSENTS; CASUALTIES

**Section 4.01 Consents to Assign.** With respect to each Consent set forth on Schedule 5.01(c), Seller shall send to the holder of each such Consent a notice in material compliance with the contractual provisions applicable to such Consent seeking such holder's consent as required.

(a) If Seller fails to obtain a Consent set forth on **Schedule 5.01(c)** prior to Closing and the failure to obtain such Consent (i) would, after giving effect to the operation of applicable Law, including the Bankruptcy Code, cause (A) the assignment of the Lease or Well affected thereby to Buyer to be void under the express terms thereof or (B) the termination of a Lease under the express terms thereof, (ii) covers a Lease or Well with an Allocated Value in excess of [ _____ Dollars ($ _____ )] (the **"Consent Threshold"**) and (iii) the aggregate Allocated Value with respect to all such un-obtained Consents satisfying clauses (i) and (ii) hereof, exceeds [ _____ Dollars ($ _____ )] (the **"Consent Deductible"**), then the Asset (or portion thereof) affected by such un-obtained Consent (each an **"Un-obtained Consent"**) shall be excluded from the Assets to be assigned to Buyer at Closing, and the Purchase Price shall be reduced by the Allocated Value of such Asset (or portion thereof) so excluded and Buyer shall deposit in the Escrow Account an amount equal to such Allocated Value (such amount, the **"Consent Deposit Amount").** In the event that an Un-obtained Consent that was not obtained prior to Closing is obtained within thirty (30) days following Closing, then, within ten (10) days after such Consent is obtained (x) Buyer shall purchase the Asset (or portion thereof) that was so excluded as a result of such Un-obtained Consent and instruct the Escrow Agent to disburse to Seller an amount equal to the Allocated Value with respect to the Asset (or portion thereof) so excluded deposited in the Escrow Account (together with all interest earned thereon) and (y) Seller shall assign to Buyer the Asset (or portion thereof) so excluded at Closing pursuant to an instrument in a form substantially similar to the Assignments or otherwise mutually acceptable to Seller and Buyer.

(b) If Seller fails to obtain a Consent set forth on **Schedule 5.01(c)** prior to Closing and the failure to obtain such Consent would not cause, after giving effect to the operation of applicable Law, (i) the assignment of the Lease or Well affected thereby to Buyer to be void under the express terms thereof or (ii) the termination of a Lease under the express terms thereof, or such Consent covers a Lease or Well with an Allocated Value less than or equal to the Consent Threshold, or the aggregate Allocated Value of all such un-obtained consents is less than or equal to the Consent Deductible, then the Asset (or portion thereof) subject to such un-obtained Consent shall nevertheless be assigned by Seller to Buyer at Closing as part of the Assets, the Purchase Price shall not be reduced, Buyer shall be solely responsible from and after the Closing for any and all Liabilities arising from the failure to obtain such Consent and Buyer shall have no claim against, and Seller shall have no Liability for, the failure to obtain such Consent.

(c) Prior to Closing and during the thirty (30) day period following Closing, Seller and Buyer shall use their commercially reasonable efforts to obtain all Consents listed on **Schedule 5.01(c);** provided, however, that neither Party shall be required to incur any Liability or pay any money in order to obtain any such Consent. Subject to the foregoing, Buyer agrees to provide Seller with any information or documentation that may be reasonably requested by Seller and/or the Third Party holder(s) of such Consents in order to facilitate the process of obtaining such Consents.

(d) If, following the thirty (30) day period following Closing, Seller fails to obtain a Consent set forth on **Schedule 5.01(c),** Seller shall instruct the Escrow Agent to disburse to Buyer an amount equal to the Allocated Value with respect to the Asset (or portion thereof) attributable to such Consent deposited in the Escrow Account (together with all interest earned thereon), and such Asset (or portion thereof) shall be retained by Seller.

**Section 4.02   Casualty or Condemnation Loss.**

(a) Notwithstanding anything herein to the contrary, from and after the Effective Time, subject to the occurrence of Closing, Buyer shall assume all risk of loss with respect to production of Hydrocarbons through normal depletion (including watering out of any well, collapsed casing or sand infiltration of any well) and the depreciation of personal property due to ordinary wear and tear, in each case, with respect to the Assets.

(b) If, during the Interim Period, any portion of the Assets is destroyed by fire or other casualty or is taken in condemnation or under right of eminent domain, Buyer shall nevertheless be required to consummate the Closing, and Seller shall elect (in its sole discretion) by written notice to Buyer prior to Closing either (i) to cause the Assets affected by such casualty or taking to be repaired or restored to at least its condition prior to such casualty or taking, at Seller's sole cost, as promptly as reasonably practicable (which work may extend after the Closing Date) or (ii) at Closing, to pay to Buyer all sums paid or payable to Seller by Third Parties by reason of such casualty or taking insofar as with respect to the Assets and shall assign, transfer and set over to Buyer or subrogate Buyer to all of Seller's right, title and interest (if any) in insurance claims, unpaid awards and other rights against Third Parties (excluding any Liabilities, other than insurance claims, of or against any Seller Indemnitees) arising out of such casualty or taking insofar as with respect to the Assets; <u>provided</u>, <u>however</u>, that in the case of (ii), Seller shall reserve and retain (and Buyer shall assign to Seller) all rights, title, interests and claims against Third Parties for the recovery of Seller's costs and expenses incurred prior to the Closing Date in pursuing or asserting any such insurance claims or other rights against Third Parties or in defending or asserting rights in such condemnation or eminent domain action with respect to the Assets. In the case of (i), Seller shall retain all rights to insurance, condemnation awards and other claims against Third Parties with respect to the casualty or taking except to the extent the Parties otherwise agree in writing.

(c) If any action for condemnation or taking under right of eminent domain is pending or threatened with respect to any Asset or portion thereof after the date of this Agreement, but no taking of such Asset or portion thereof occurs prior to the Closing Date, Buyer shall nevertheless be required to close and Seller, at Closing, shall assign, transfer and set over to Buyer or subrogate Buyer to all of Seller's right, title and interest (if any) in such condemnation or eminent domain action, including any future awards therein, insofar as they are attributable to the Assets threatened to be taken, except that Seller shall reserve and retain (and Buyer shall assign to Seller) all rights, titles, interests and claims against Third Parties for the recovery of Seller's costs and expenses incurred prior to the Closing in defending or asserting rights in such action with respect to the Assets.

## ARTICLE V. REPRESENTATIONS AND WARRANTIES

**Section 5.01   Representations and Warranties of Seller.** Seller represents and warrants to Buyer as follows:

(a) <u>Organization</u>. Seller is [duly formed], validly existing and (to the extent applicable) in good standing under the Laws of the state of [ ___ ].

by **Qualification**. Seller is duly qualified to do business and is in good standing in each jurisdiction in which the nature of its business as now conducted makes such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, have a Material Adverse Effect.

(c)     <u>Authorization /Consents</u>. The execution and delivery by Seller of this Agreement and the performance of its obligations hereunder have been duly and validly authorized by all requisite action by Seller's governing body and under its organizational documents. Other than as set forth on **Schedule 5.01(c),** such authorization as is required by the Bankruptcy Court, those consents of Governmental Authorities customarily obtained post-Closing and such Consents that the failure to obtain, individually or in the aggregate, would not have a Material Adverse Effect, Seller is not required to (i) give any notice, make any filing with or obtain any authorization, consent or approval from any Governmental Authority or (ii) to Seller's Knowledge, obtain any consent from any other Third Party (in each case) in order for Seller to consummate the transactions contemplated by this Agreement (each, a **"Consent").**

(d)     <u>Enforceability</u>. Subject to the entry of the Sale Order by the Bankruptcy Court, this Agreement has been duly executed and delivered by Seller, and constitutes the valid and legally binding obligation of Seller, enforceable in accordance with its terms and conditions except insofar as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such principles are considered in a proceeding at Law or in equity.

(e)     <u>Noncontravention</u>. Except as described on **Schedule 5.01(e),** and assuming (i) the entry of the Sale Order by the Bankruptcy Court, (ii) compliance with all consent requirements and preferential rights to purchase or similar rights applicable to the transactions contemplated hereby and (iii) the release at the Closing of the mortgages and security interests upon the Assets securing Seller's and/or its Affiliates' credit facilities, neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby by Seller will violate or breach the terms of, cause a material default under, result in acceleration of, create in any party the right to accelerate, terminate, modify or cancel or require any notice under: (A) any applicable Law, (B) the organizational documents of Seller, or (C) any Material Contract, other than, in the case of clauses (A) and (C), any such items that, individually or in the aggregate, would not have a Material Adverse Effect.

(f)     <u>Litigation</u>. Except for the Bankruptcy Case and the litigation described on **Schedule 5.01(f),** as of the date of this Agreement there are no suits, actions or litigation before or by any Governmental Authority that are pending or, to Seller's Knowledge, threatened against Seller that are attributable to Seller's ownership of the Assets and that, individually or in the aggregate, would have a Material Adverse Effect.

(g)     <u>Brokers' Fees</u>. Except as described on **Schedule 5.01(g),** Seller has no Liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer will be liable or obligated.

(h)     <u>Taxes</u>. Except as described on **Schedule 5.01(h),** (i) Seller has timely filed or caused to be filed on its behalf all Tax Returns attributable to Production Taxes that are required to be filed by it (taking into account any valid extension of the due date for filing), and all such Tax Returns are true and correct in all material respects; (ii) during the period of Seller's ownership of the Assets, all material Production Taxes that have become due and payable have been duly paid, except to the extent being disputed in good faith; (iii) there are no administrative proceedings or lawsuits pending against the Assets by any Governmental Authority with respect to such Taxes; and (iv) there are no Liens on any of the Assets that arose in connection with the failure (or alleged failure) to pay any such Tax other than Taxes not yet delinquent or, if delinquent, that are being disputed in good faith.

(i) *Royalty Payments*. Except as described on **Schedule 5.01(i),** to Seller's Knowledge, where Seller is the party responsible for royalty payments, Seller has paid all shut-in royalties, overriding royalties and other royalties or similar burdens on production with respect to the Leases that have become due and payable as of the Effective Time (**"Royalties"**) (other than (i) immaterial amounts and (ii) royalties held in escrow or suspense accounts or escheated) due from Seller.

(j) <u>Hydrocarbon Sales</u>. Except as described on **Schedule 5.01(j),** Seller is not obligated by virtue of a production payment or any other arrangement, other than gas balancing arrangements, to deliver Hydrocarbons produced from the Properties at some future time without then or thereafter receiving payment for the production commensurate with Seller's ownership in and to the Assets.

(k) <u>Environmental Notices</u>. Except as described on **Schedule 5.01(k)** and except as would not, individually or in the aggregate, have a Material Adverse Effect, as of the date of this Agreement, Seller has not received any written notice from a Governmental Authority of a material violation of any Environmental Laws relating to the Assets where such violation has not been previously cured or otherwise remedied. Except as set out on **Schedule 5.01(k)** and except as would not, individually or in the aggregate, have a Material Adverse Effect, to Seller's Knowledge, no condition currently exists on the Assets which would reasonably be expected to result in a violation of any Environmental Law. This **Section 5.01(k)** is the sole and exclusive representation by Seller with respect to any Environmental Law or environmental matter.

(l) <u>Compliance with Laws</u>. Except as described on **Schedule 5.01(l)** and except as would not, individually or in the aggregate, have a Material Adverse Effect, to Seller's Knowledge, Seller's operation of the Assets is in compliance with all Laws, orders, rules and regulations of all Governmental Authorities having or asserting jurisdiction relating to the ownership and operation thereof, including the production of all Hydrocarbons attributable thereto. Since the Effective Time, Seller has not received any written notice from any Governmental Authority of any such violation of any Laws, except as would not, individually or in the aggregate, have a Material Adverse Effect. Notwithstanding the foregoing, Seller makes no representation or warranty in this **Section 5.01(l)** with respect to any matters relating to the environment or Environmental Law.

(m) <u>Contracts; Leases</u>. To Seller's Knowledge, **Exhibit A - Part 6** lists all Material Contracts as of the date hereof.

(n) <u>AFEs</u>. **Schedule 5.01(n)** contains a true and correct list as of the date hereof of all material authorities for expenditures (collectively, **"AFEs"**) to drill or rework Wells or for capital expenditures with respect to the Assets that have been proposed by any Person having authority to do so other than internal AFEs of Seller not delivered to Third Parties. For the purposes of this **Section 5.01(n),** an AFE shall be material if, net to Seller's interest, such AFE exceeds [Dollars ($           )] and such AFE is (or was as of the date hereof) valid and outstanding.

(o) <u>Preferential Purchase Rights</u>. To Seller's Knowledge, **Schedule 5.01(o)** sets forth those preferential rights to purchase or similar rights that are applicable to the transfer of the Assets in connection with the transactions contemplated hereby.

(p) <u>Imbalances</u>. Except as set forth on **Schedule 5.01(p),** to Seller's Knowledge, where Seller is the operator, there are no material Imbalances associated with the Assets as of the dates set forth on **Schedule 5.01(p).**

(q) <u>Foreign Person</u>. Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

**Section 5.02    Representations and Warranties of Buyer**

Buyer represents and warrants to Seller as follows:

(a)      <u>Organization</u>. Buyer is a [ _____ ] duly [organized], validly existing and

in good standing under the Laws of [____].

    (b)    <u>Qualification</u>. Buyer is duly qualified to do business and is in good standing in each jurisdiction in which the nature of its business as now conducted makes such qualification necessary, except where the failure to be so qualified or in good standing would not materially hinder or impede the consummation by Buyer of the transactions contemplated by this Agreement.

    (c)    <u>Authorization/Consents</u>. The execution and delivery by Buyer of this Agreement and the performance of its obligations hereunder have been duly and validly authorized by all requisite action by Buyer's governing body and under its organizational documents. Subject to the entry of a Sale Order by the Bankruptcy Court and except as would not materially hinder or impede the consummation by Buyer of the transactions contemplated by this Agreement, Buyer is not required to give any notice to, make any filing with or obtain any authorization, consent, or approval from any Governmental Authority or, except as set forth on **Schedule 5.02(c)** hereto, any Third Party in order for Buyer to consummate the transactions contemplated by this Agreement.

    (d)    <u>Enforceability</u>. This Agreement has been duly executed and delivered by Buyer and constitutes the valid and legally binding obligation of Buyer, enforceable in accordance with its terms and conditions, except insofar as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such principles are considered in a proceeding at Law or in equity.

    (e)    <u>Noncontravention</u>. Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby by Buyer will violate or breach the terms of, cause a default under, result in acceleration of, create in any party the right to accelerate, terminate, modify or cancel or require any notice under: (i) any applicable Law, (ii) the organizational documents of Buyer, or (iii) any material contract of Buyer, other than, in the case of clauses (i) and (iii), any such items that, individually or in the aggregate, would not materially hinder or impede the consummation by Buyer of the transactions contemplated by this Agreement.

    (f)    <u>Litigation</u>. There are no suits, actions or litigation before or by any Governmental Authority that are pending or, to Buyer's Knowledge, threatened against Buyer or any Affiliate of Buyer that would materially hinder or impede the consummation by Buyer of the transactions contemplated by this Agreement.

    (g)    <u>Brokers' Fees</u>. Buyer has no Liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller will be liable or obligated.

    (h)    <u>Financing</u>. Buyer has (and at the Closing will have) sufficient cash, available lines of credit or other sources of immediately available funds (in United States dollars) to enable Buyer to pay the Purchase Price to Seller at the Closing. True and complete copies of the documentation for Buyer's sources of debt or equity financing have been provided to Seller. Buyer does not have any reason to believe that the financing required to consummate the transactions contemplated by this Agreement will not be available to Buyer on a timely basis to consummate the transactions contemplated by this Agreement.

    (i)    <u>Adequate Assurances Regarding Contracts</u>. Buyer will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Contracts.

    (j) <u>Investment</u>. Buyer is an experienced and knowledgeable investor in the oil and gas business. Prior to entering into this Agreement, Buyer was advised by and has relied solely on its own legal, tax and other professional counsel concerning this Agreement, the Assets and the value thereof. In making the decision to enter into this Agreement and consummate the transactions contemplated hereby, Buyer has relied solely on the basis of its own independent valuation and due diligence investigation of the Assets.

(k) <u>NORM, Wastes and Other Substances</u>. Buyer acknowledges that the Assets have been used for exploration, development and production of oil and gas and that there may be petroleum, produced water, wastes or other substances or materials located in, on or under the Assets or associated with the Assets. Equipment and sites included in the Assets may contain asbestos, naturally occurring radioactive material (**"NORM"**) or other Hazardous Substances. NORM may affix or attach itself to the inside of Wells, materials and equipment as scale or in other forms. The Wells, materials and equipment located on the Assets or included in the Assets may contain NORM, asbestos and other wastes or Hazardous Substances. NORM containing material and/or other wastes or Hazardous Substances may have come in contact with various environmental media, including without limitation, water, soils or sediment. Special procedures may be required for the assessment, remediation, removal, transportation or disposal of environmental media, wastes, asbestos, NORM and Hazardous Substances from the Assets.

(l) <u>Accredited Investor</u>. Buyer is an "accredited investor," as such term is defined in Regulation D of the Securities Act of 1933, as amended. Buyer is acquiring the Assets for its own account and not for distribution or resale in any manner that would violate any state or federal securities Law.

## ARTICLE VI. CERTAIN COVENANTS

**Section 6.01 Confidentiality.** Buyer agrees (a) to keep any non-public information or documents obtained in connection with this Agreement confidential, (b) not to use any such information or documents for any purpose other than to evaluate, negotiate and consummate the transactions contemplated by this Agreement and (c) not to disclose the terms hereof or thereof to any Person other than Buyer's Affiliates and Buyer's and its Affiliates' professional advisors and consultants, financial advisors and bankers ("Advisors"), except in each case with the prior written consent of Seller, which consent may be granted, conditioned or withheld in Seller's sole and absolute discretion; provided that Buyer shall ensure that all of Buyer's and its Affiliates' Advisors are made aware, prior to the disclosure of such confidential information to the Advisors, of the confidential nature thereof, that the Advisors shall owe a duty of confidence to Seller as well as Buyer and obtain the Advisors' written undertaking for the benefit of Seller to hold such confidential information in confidence. Notwithstanding the foregoing, if required by Law or judicial or administrative order or process, Buyer may disclose information and documents required to be held confidential hereunder to the extent, and only to the extent, necessary to comply with such Law or judicial or administrative order or process. Buyer shall promptly notify Seller of such required disclosure and shall request that confidential treatment be afforded any such disclosed information. If the Closing should occur, the foregoing confidentiality restriction on Buyer shall terminate (except as to the Excluded Assets).

**Section 6.02 Dispositions of Assets.** During the Interim Period, Seller shall not, without the prior consent of Buyer (which consent shall not be unreasonably withheld or delayed), transfer, farmout, sell, encumber or otherwise dispose of any Assets, except for (a) sales and dispositions of Hydrocarbon production in the ordinary course of business, (b) sales of equipment that is no longer necessary in the operation of the Assets or for which replacement equipment is obtained, (c) transfers, farmouts, property exchanges, sales or other similar dispositions of Assets, in one or more transactions, for a net present value exceeding [   Dollars ($        )] of consideration (in any form) and (d) sales, transfers or similar dispositions of Assets in accordance with the exercise of any preferential rights to purchase or similar rights set forth on Schedule 5.01(o) (and, following any such sale, transfer or disposition pursuant to this clause (d), the Purchase Price shall be reduced by the Allocated Value of the Assets, or portion thereof, so sold or transferred).

**Section 6.03 Operations.** During the Interim Period, except as set forth on Schedule 6.03 and except as otherwise ordered by the Bankruptcy Court or as otherwise permitted by the orders of the Bankruptcy Court, Seller shall not, without Buyer's prior consent (which consent shall not be unreasonably withheld or delayed), (a) propose, under any joint operating agreement, any operation with respect to the Assets reasonably expected to cost Seller in excess of [        Dollars ($        )]; (b) consent to any operation with respect to the Assets reasonably expected to cost Seller in excess of [
_____ Dollars ($_____ )]that is proposed by any Third Party, or elect not to participate in any operation with respect to the Assets that is proposed by any Third Party; (c) enter into any contract that would

constitute a Material contract hereunder, except in each case of subsections (a) through (e) above where such operation is (i) in connection with an AFE listed on Schedule 5.01(n), (ii) in response to an emergency, or (iii) necessary to maintain or prevent forfeiture of a Lease or other Property; (d) reduce or terminate (or cause to be reduced or terminated) any insurance coverage now held in connection with the Assets; or (e) except for any Liens that would not attach to or encumber the Assets following Closing, mortgage or pledge or create or suffer to exist any encumbrance on any of the Assets. Buyer acknowledges that Seller owns undivided interests in certain of the Properties comprising the Assets that it may not be the operator thereof, and Buyer agrees that the acts or omissions of the other working interests owners (including the operators) who are not Seller or Affiliates of Seller shall not constitute a breach of the provisions of this Section 6.03, nor shall any action required by a vote of working interest owners constitute such a breach so long as Seller has voted its interest in a manner that complies with the provisions of this Section 6.03.

**Section 6.04 Governmental Bonds; Operator.** Buyer acknowledges that none of the bonds, letters of credit and guarantees, if any, posted by Seller or its Affiliates with Governmental Authorities and relating to the Assets, are transferable or are to be transferred to Buyer. On or before the Closing Date, Buyer shall obtain, or cause to be obtained in the name of Buyer or its designee, replacements for such bonds, letters of credit and guarantees to the extent such replacements are necessary to permit the cancellation of the bonds, letters of credit and guarantees posted by Seller and/or its Affiliates. In addition, at or prior to Closing, Buyer shall deliver to Seller evidence of (a) the posting of bonds or other security with all applicable Governmental Authorities meeting the requirements of such authorities for Buyer to own and, where appropriate, operate the Assets and (b) Buyer's qualification to own and operate the Assets in the jurisdictions where the Assets are located.

**Section 6.05 Amendment of Schedules.** During the Interim Period, Seller may correct or supplement any Schedule hereto by furnishing such corrected or supplemented Schedule to Buyer (and such corrected or supplemented information shall be deemed to amend this Agreement for all purposes); provided, however, any corrected or supplemented information set forth on such corrected or supplemented Schedule shall be disregarded (a) in determining whether the condition set forth in Section 8.02(a) has been satisfied to the extent and only to the extent that such corrected or supplemented information has a material adverse effect on the Properties and (b) to the extent such corrected or supplemented information reduces or increases the Allocated Value of a Well, on a Well by Well basis, by an amount greater than or equal to the Consent Threshold.

**Section 6.06 Bankruptcy Actions.** Buyer covenants and agrees that it shall cooperate with Seller in connection with furnishing information or documents to Seller to satisfy the requirements of adequate assurance of future performance under Section 365(f)(2)(B) of the Bankruptcy Code.

**Section 6.07 Reasonable Best Efforts.** Subject to any applicable order of the Bankruptcy Court, and otherwise on the terms and subject to the conditions of this Agreement, each of Seller and Buyer shall use its reasonable best efforts to cause the Closing to occur as promptly as practicable, and neither Party shall take any action to prevent or delay, or fail to take any action in order to prevent or delay, the Closing from occurring as promptly as practicable. Without limiting the generality of the foregoing, the Parties shall (and shall cause their respective directors, officers and subsidiaries, and use their reasonable best efforts to cause their respective Affiliates, employees, agents, attorneys, accountants and representatives, to) consult and cooperate with and provide reasonable assistance to each other and otherwise use reasonable best efforts in connection with (a) obtaining all necessary consents, licenses, qualifications or other permission or action by, and giving all necessary notices to and making all necessary filings with and applications and submissions to, any Governmental Authority or other Person with respect to the consummation of the transactions contemplated by this Agreement, and (b) in general, consummating and making effective the transactions contemplated hereby.

# ARTICLE VII. BANKRUPTCY MATTERS

## Section 7.01   Auction and Bidding.

(a)     <u>Auction</u>. Consummation of the transactions provided for herein is subject to the determination by Seller that this Agreement is the highest or otherwise best offer from a Qualified

Bidder for the Assets and the assumption of the Assumed Obligations. In connection with this determination, Seller may conduct an auction (the **"Auction"**) of its assets in accordance with Section 363 of the Bankruptcy Code and the Bidding Procedures, as may be modified by the Bidding Procedures Order.

(b)    Bidding. Seller shall offer the Assets for sale in accordance with the Bidding Procedures and shall solicit Bids from Qualified Bidders. If more than one competing proposal is timely received by Seller, Seller may conduct the Auction in accordance with the Bidding Procedures and the Bidding Procedures Order.

## Section 7.02    Certain Contract Matters.

(a)    Leases. The Leases listed on **Exhibit A—Part 1** are to be transferred to Buyer as part of the sale of the Assets. To the extent any Lease constitutes an executory contract or unexpired lease of real property under Section 365 of the Bankruptcy Code, such Lease shall be assumed by Seller and assigned by Seller to Buyer pursuant to Section 365 of the Bankruptcy Code.

(b)    Contracts. Seller shall assign to Buyer, and Buyer shall assume, the Contracts under Section 365 of the Bankruptcy Code pursuant to the Sale Order. Buyer shall pay all Contract Cure Amounts in connection with the assumption and assignment of the Contracts. To the extent any Contract does not constitute an executory contract subject to assumption and assignment under Section 365 of the Bankruptcy Code, then the rights and obligations under such Contracts shall be transferred to Buyer as part of the sale of the Assets with such rights and obligations (including all Contract Cure Amounts) being expressly assumed by Buyer.

**Section 7.03 Appeal.** In the event the Bidding Procedures Order or the Sale Order shall be appealed, Seller and Buyer shall use reasonable best efforts to defend such appeal.

## ARTICLE VIII. CONDITIONS TO CLOSING

**Section 8.01 Conditions to Seller's Obligations.** The obligations of Seller to consummate the transactions provided for herein are subject, at the option of Seller, to the fulfillment on or prior to the Closing Date of each of the following conditions:

(a)    Representations. The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all respects on and as of the Closing Date (provided that any representations and warranties expressly qualified by materiality or a like standard shall be true and correct in all respects on and as of the Closing Date), with the same force and effect as though such representations and warranties had been made or given on and as of the Closing Date (other than representations and warranties that are made as of another date, which shall be so true and correct as of such date only); provided, however, that this condition shall be deemed to have been satisfied even if such representations and warranties are not true and correct unless the individual or aggregate impact of all inaccuracies of such representations and warranties would materially hinder or impede the consummation by Buyer of the transactions contemplated by this Agreement.

(b)    Performance. Buyer shall have materially performed or complied with all obligations, agreements and covenants contained in this Agreement as to which performance or compliance by Buyer is required prior to or at the Closing.

(c)    Execution and Delivery of Closing Documents. Buyer shall have executed and acknowledged, as appropriate, and shall be ready, willing and able to deliver to Seller and the Escrow Agent, as applicable, all of the documents described in **Section 9.04** and Buyer shall be ready, willing and able to deliver to Seller the Adjusted Purchase Price.

(d)    Performance Bonds. Buyer shall have obtained, or caused to be obtained, in the name of Buyer, replacements for Seller's and/or Seller's Affiliates' bonds, letters of credit and

guarantees, and such other bonds, letters of credit and guarantees to the extent required by **Section 6.04.**

**Section 8.02 Conditions to Buyer's Obligations.** The obligations of Buyer to consummate the transactions provided for herein are subject, at the option of Buyer, to the fulfillment on or prior to the Closing Date of each of the following conditions:

(a)     Representations. The representations and warranties of Seller set forth in this Agreement shall be true and correct in all respects on and as of the Closing Date (provided that any representations and warranties expressly qualified by materiality or a like standard shall be true and correct in all respects on and as of the Closing Date), with the same force and effect as though such representations and warranties had been made or given on and as of the Closing Date (other than representations and warranties that are made as of another date, which shall be so true and correct as of such date only); provided, however, that this condition shall be deemed to have been satisfied even if such representations and warranties are not true and correct unless the individual or aggregate impact of all inaccuracies of such representations and warranties has resulted or would reasonably be expected to result in a Material Adverse Effect.

(b)     Performance. Seller shall have materially performed or complied with all obligations, agreements and covenants contained in this Agreement as to which performance or compliance by Seller is required prior to or at the Closing.

(c)     Execution and Delivery of Closing Documents. Seller shall have executed and acknowledged, as appropriate, and shall be ready, willing and able to deliver to Buyer all of the documents described in **Section 9.03.**

**Section 8.03 Conditions to the Parties' Obligations.** The obligations of Seller and Buyer to consummate the transactions provided for herein are subject to the fulfillment on or prior to the Closing Date of each of the following conditions:

(a)     Final Order. The Sale Order shall have been entered and shall have become a Final Order.

(b)     No Injunctions or Restraints. No applicable Law enacted, entered, promulgated, enforced or issued by any Governmental Authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement shall be in effect.

**Section 8.04 Closing Over Breaches or Unsatisfied Conditions.** Notwithstanding anything to the contrary contained in this Agreement, if there is a failure of any condition to be satisfied in favor of Buyer or if there is a breach of any representation or warranty or covenant of Seller to the Knowledge of Buyer and Buyer elects to proceed with the Closing, then the condition that is unsatisfied or the representation, warranty or covenant that is breached at the Closing Date will be deemed waived by Buyer, and, absent a written waiver, the terms of which shall govern, Buyer will be deemed to fully release and forever discharge Seller on account of any and all Liabilities with respect to the same, including any claims for indemnification hereunder, and Buyer agrees, on behalf of itself and the Buyer Affiliates, not to make, file or bring any claim or cause of action with respect to such released Liabilities.

**Section 8.05 Frustration of Closing Conditions.** Neither Buyer nor Seller may rely on the failure of any condition set forth in this Article VIII to be satisfied if such failure was caused by such Party's failure to use its reasonable best efforts to cause the Closing to occur, as required by Section 6.07.

## ARTICLE IX. CLOSING

**Section 9.01 Time and Place of Closing.** If the conditions referred to in Article VIII have been satisfied or waived in writing, the sale by Seller and the purchase by Buyer of the Assets pursuant to this Agreement (the "Closing") shall take place at the offices of Hoover Slovacek LLP, counsel to Seller, located at Galleria Tower II, 5051 Westheimer, Suite 1200, Houston, Texas 77056, at 10:00 a.m., Houston time, on the ____(_____th) Business Day following the satisfaction (or, to the extent permitted, the waiver) of

the conditions set forth in Article VIII or such earlier or later date as is mutually agreed by the Parties (the date on which the Closing occurs is referred to in this Agreement as the "Closing Date").

**Section 9.02 Closing Statement; Adjustments to Purchase Price at Closing.** Seller shall prepare and deliver to Buyer, not later than three (3) Business Day prior to Closing, a statement which sets forth Seller's good faith estimate of the adjustments to the Purchase Price (accompanied by supporting documentation) made in accordance with the following provisions (the "Closing Statement"):

(a)     At the Closing, the Purchase Price shall be increased, as set forth in the Closing Statement, in the following amounts:

(i)     all costs and expenses (including royalties, Production Taxes, Operating Expenses, and overhead, but excluding rentals, lease renewals, and other lease maintenance payments) paid by Seller that are (A) attributable to the Assets and (B) attributable to any period of time from and after the Effective Time;

(ii)     the Overhead Costs (less any amounts received by Seller from Third Parties pursuant to any applicable joint operating agreement burdening the Assets);

(iii)     the value of all Hydrocarbons produced from or attributable to the Properties prior to the Effective Time that are in storage to the bottom of the flange prior to sale and that are upstream of the sales metering point as of the Closing Date;

(iv)     the net amount of any Imbalances as of the Effective Time, if such net amount is positive, with the value to be based upon the sales price as of the Effective Time under the applicable marketing or sales contract; and

(v)     any other amount provided for in this Agreement or agreed upon by Seller and Buyer.

(b)     At the Closing, the Purchase Price shall be decreased, as set forth in the Closing Statement, in the following amounts:

(i)     except for any Excluded Asset, the amount of all proceeds received by Seller with respect to the Assets that are attributable to the period of time from and after the Effective Time (but in no event including Hydrocarbons produced prior to the Effective Time);

(ii)     the Allocated Value of any Assets removed from the transaction pursuant to **Section 4.01(a)** or **Section 6.02(d);**

(iii)     the net amount of any Imbalances as of the Effective Time, if such net amount is negative, with the value to be based upon the sales price as of the Effective Time under the applicable marketing or sales contract; and

(iv)     any other amount provided for in this Agreement or agreed upon by Seller and Buyer.

(c)     Buyer shall prepare within thirty (30) days after the Closing Date and furnish to Seller a final accounting statement setting forth the adjustments and pro-rating of any amounts provided for in this **Article IX** or elsewhere in this Agreement (the **"Final Accounting Statement"**) together with reasonable supporting documentation. Seller shall within five (5) days after receipt of the Final Accounting Statement deliver to Buyer a written report (together with reasonable supporting documentation) containing any changes that Seller proposes be made to such Final Accounting Statement (the **"Dispute Notice"**). The Parties shall undertake to agree on the

final adjustment amounts and such final adjustment amounts shall be paid by Buyer or Seller, as appropriate, not later than five (5) days after such agreement.

(d)     If Seller and Buyer are unable to resolve the matters addressed in the Dispute Notice, each of Buyer and Seller shall, within ten (10) Business Days after the delivery of such Dispute Notice, summarize its position with regard to such dispute in a written document of ten pages or less and submit such summaries to the Bankruptcy Court, together with the Dispute Notice, the Final Accounting Statement and any other documentation such Party may desire to submit. Any decision rendered by the Bankruptcy Court pursuant hereto shall be final, conclusive and binding on Seller and Buyer and will be enforceable against any of the Parties in any court of competent jurisdiction, and such final adjustment amounts shall be paid by Buyer or Seller, as appropriate, not later than five (5) days after such decision.

**Section 9.03    Actions of Seller at Closing.** At the Closing, Seller shall:

(a)     execute and deliver to Buyer executed and notarized assignments, substantially in the form of **Exhibit C** (the **"Assignments"),** in sufficient counterparts to facilitate recording in the applicable counties and parishes relating to the Assets, and such other instruments, in form and substance mutually agreed upon by Buyer and Seller, as may be necessary or desirable to convey ownership, title and possession of the Assets to Buyer;

(b)     deliver to Buyer on forms reasonably acceptable to Buyer transfer orders or letters in lieu thereof directing all purchasers of production to make payment to Buyer of proceeds attributable to production from the Assets from and after the Effective Time, for delivery by Buyer to the purchasers of production;

(c)     deliver an executed statement described in Treasury Regulation §1.1445-2(b)(2) certifying that Seller is not a "foreign person" within the meaning of the Code; and

(d)     execute and deliver any other agreements that are provided for herein or are necessary or desirable to effectuate the transactions contemplated hereby.

**Section 9.04    Actions of Buyer at Closing.** At the Closing, Buyer shall:

(a)     deliver to the Escrow Agent written instruction, in accordance with the terms of the Escrow Agreement, to release the Earnest Money to Seller by wire transfer;

(b)     deliver to Seller by wire transfer as set forth in **Section 3.01** an amount equal to the Adjusted Purchase Price;

(c)     deliver to Seller a certificate executed by the [secretary] of Buyer, dated as of the Closing Date, attaching, and certifying on behalf of Buyer, complete and correct copies of (A) the resolutions of the [    ] of Buyer authorizing the execution, delivery, and performance by Buyer of this Agreement and the transactions contemplated hereby and (B) any required approval by Buyer's [ ] of this Agreement and the transactions contemplated hereby;

(d)     deliver to Seller notarized counterparts of the Assignments executed by Buyer; and

(e)     execute, acknowledge and deliver any other agreements provided for herein or necessary or desirable to effectuate the transactions contemplated hereby.

## ARTICLE X. CERTAIN POST-CLOSING OBLIGATIONS

**Section 10.01 Operation of the Assets After Closing.** It is expressly understood and agreed that neither Seller nor any of its Affiliates shall be obligated to continue operating any of the Assets, or to provide any support services relating thereto, upon and after the Closing and Buyer hereby assumes full responsibility for operating (or causing the operation of) all Assets upon and after the Closing. Seller and Buyer shall execute, and Buyer shall promptly file, change of operator regulatory forms as may be required

{851243-00009 TJJ 9/16/2015 00998594.DOCX 1 }

with the appropriate Governmental Authority. Seller agrees to reasonably cooperate (without any obligation to expend money) with Buyer following Closing to assist Buyer in its efforts to be named successor operator with respect to the Assets.

**Section 10.02 Files.** Seller shall make the Files available for pickup by Buyer within ten (10) Business Days after the Closing and Buyer shall pick up such Files on such date or within five (5) Business Days thereafter.

**Section 10.03 Financial Records and Access to Information.** For a period of up to six (6) months following the Closing Date, Seller shall make the Financial Records available to Buyer and its representatives at Seller's offices, and shall provide Buyer with reasonable access, at reasonable times and upon prior notice, and at no cost to Seller, to the employees of Seller associated with the preparation of those Financial Records for purposes of performing Buyer's audits and financial and tax filings required by a Governmental Authority.

**Section 10.04 Further Cooperation.** After the Closing, and subject to the terms and conditions of this Agreement, each Party, at the request of the other and without additional consideration, shall execute and deliver, or shall cause to be executed and delivered from time to time, such further instruments of conveyance and transfer and shall take such other action as the other Party may reasonably request to convey and deliver the Assets to Buyer in the manner contemplated by this Agreement. After the Closing, the Parties will cooperate to have all proceeds received attributable to the Assets paid to the proper Party hereunder and to have all expenditures to be made with respect to the Assets made by the proper Party hereunder.

**Section 10.05 Document Retention.**

(a)    Inspection. Subject to the provisions of **Section 10.05,** Buyer agrees, and will cause its respective assigns to agree, that the Files shall be open for inspection by representatives of Seller at reasonable times and upon reasonable notice during regular business hours for a period of four (4) years following the Closing Date (or for such longer period as may be required by Law or Governmental Authorities) and that Seller may, during such period and at its expense, make such copies thereof as it may reasonably request.

(b)    Destruction. Without limiting the generality of the foregoing, for a period of four (4) years after the Closing Date (or for such longer period as may be required by Law or by Governmental Authorities), Buyer shall not, and shall cause its respective assigns to agree that they shall not, destroy or give up possession of any original or final copy of the Files without first offering Seller the opportunity, at Seller's expense (without any payment to Buyer), to obtain such original or final copy or a copy thereof.

**Section 10.06 Suspense Accounts.** At Closing, Seller shall transfer or cause to be transferred to Buyer all funds held by Seller in suspense related to proceeds of production and attributable to Third Parties' interests in the Properties or Hydrocarbon production from the Properties, including funds suspended awaiting minimum disbursement requirements, funds suspended under division orders and funds suspended for title and other defects. Buyer agrees to administer all such accounts and assume all payment obligations relating to such funds in accordance with all applicable Laws, rules and regulations and shall be liable for the payment thereof to the proper parties and such obligations shall become part of the Assumed Obligations.

## ARTICLE XI. TERMINATION

**Section 11.01 Right of Termination.** This Agreement and the transactions contemplated hereby may be completely terminated at any time at or prior to the Closing:

(a)    by mutual written consent of the Parties;

(b) by Seller, by written notice to Buyer, at Seller's option, if any of the conditions set forth in **Section 8.01** or **Section 8.03** is not satisfied and is incapable of being satisfied at or prior to the Outside Date;

(c) by Buyer, by written notice to Seller, at Buyer's option, if any of the conditions set forth in **Section 8.02** or **Section 8.03** is not satisfied and is incapable of being satisfied at or prior to the Outside Date;

(d) by either Party, by written notice to the other, if the sum of all Un-obtained Consents exceeding the Consent Threshold exceeds [___] percent ([_]%) of the Purchase Price;

(f) by either Party, by written notice to the other Party, if the Bankruptcy Court enters a Final Order following Seller's acceptance of a Bid from a Successful Bidder from a person other than Buyer (an **"Alternative Transaction"**) or a Final Order confirming any plan of reorganization of Seller under the Bankruptcy Code (other than pursuant to this Agreement);

(g) by either Party, by written notice to the other Party, if the Closing does not occur on or prior to the Outside Date; provided, however, that the right to terminate this Agreement under this **Section 11.01(f)** shall not be available to any Party whose breach of a representation or warranty in this Agreement or whose action or failure to act in breach of this Agreement has been a principal cause or resulted in the failure of the Closing to occur on or before such date; or

(h) by either Party, by written notice to the other Party, if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

**Section 11.02  Effect of Termination; Earnest Money.**

(a) In the event that the Closing does not occur as a result of either Party exercising its right not to close pursuant to **Section 11.01**, then, except for the provisions of **Section 1.01, Section 1.02, Section 6.01,** this **Section 11.02, Section 12.06, Section 12.08, Article XIII** and **Article XIV** (other than **Section 14.01, Section 14.02,** and **Section 14.03),** this Agreement shall thereafter be null and void and neither Party shall have any rights or obligations under this Agreement.

(b) If this Agreement terminates pursuant to **Section 11.01(b)** or **Section 11.01(f)** on account of the failure of one or more of the conditions set forth in **Section 8.01,** then within five (5) days following such termination, Seller and Buyer shall instruct the Escrow Agent to disburse the Earnest Money and all interest earned thereon to Seller and close the Escrow Account. In such event, the delivery of the Earnest Money to Seller shall constitute liquidated damages for any loss suffered by Seller, and Buyer shall have no further liability to the Seller Indemnitees of any kind or character (except as provided under **Section 6.01).**

(c) If this Agreement is terminated for any reason other than as provided in **Section 11.02(b),** then within five (5) days following such termination, Seller and Buyer shall instruct the Escrow Agent to disburse the Earnest Money and all interest earned thereon to Buyer and to close the Escrow Account. In such event, the return of the Earnest Money to Buyer shall constitute liquidated damages for any loss suffered by Buyer, and Seller shall have no further liability to the Buyer Affiliates of any kind or character.

(d) THE PARTIES ACKNOWLEDGE AND AGREE THAT (i) EACH PARTY'S ACTUAL DAMAGES RESULTING FROM ANY SUCH TERMINATION UNDER THIS **Article XI** WOULD BE DIFFICULT, IF NOT IMPOSSIBLE TO CALCULATE, (ii) THE EARNEST MONEY IS A FAIR AND REASONABLE ESTIMATE OF THE TERMINATING PARTY'S LIQUIDATED DAMAGES IN LIGHT OF THE UNCERTAINTIES IN CALCULATING THE ACTUAL DAMAGES THAT WOULD BE SUFFERED BY SUCH PARTY UNDER THE CIRCUMSTANCES SET FORTH IN THIS **Article XI,** AND (iii) SUCH LIQUIDATED DAMAGES ARE NOT A PENALTY. Notwithstanding anything to the contrary in this Agreement, in no event shall either Party be entitled to receive any indirect, consequential,

punitive or exemplary damages, or damages for lost profits of any kind or loss of business opportunity.

## ARTICLE XII. ASSUMPTION AND INDEMNIFICATION

**Section 12.01 Assumption and Indemnity.** As of the Closing, Buyer assumes and agrees to pay, perform and discharge, or cause to be paid, performed, and discharged, all obligations and Liabilities with respect to the Assets whether arising prior to, on or after the Effective Time including, without limitation, as follows:

        (a)      all obligations (whether arising by Law or by contract) to properly plug, replug and abandon all wells and dismantle, cap and bury all associated flow lines associated with the Assets, decommission or remove all personal property, fixtures and related equipment now located on the land covered by or attributable to the Properties or other Assets or hereafter placed thereon, and all such obligations to cleanup and restore such lands;

        (b)      all Production Taxes allocable to Buyer pursuant to **Section 2.04** (except to the extent any such Production Tax is economically borne by Buyer pursuant to the application of **Section 9.02(a)(i)**);

        (c)      all Liabilities relating in any way to the Assets (including Seller's operation of such Assets at any time) arising under Environmental Law or arising from, attributable to or alleged to be arising from or attributable to, a violation of or the failure to perform any obligation imposed by any Environmental Law or otherwise relating to the environmental condition of the Assets; FOR AVOIDANCE OF DOUBT, BUYER'S ASSUMPTION, AND AGREEMENT TO PAY, PERFORM OR DISCHARGE SUCH LIABILITIES APPLIES REGARDLESS OF WHETHER THE LIABILITIES ARE THE RESULT OF: (i) STRICT LIABILITY, (ii) THE VIOLATION OF ANY LAW BY ANY PERSON INCLUDING SELLER OR BY A PREEXISTING CONDITION OR (iii) THE SOLE, CONCURRENT OR COMPARATIVE NEGLIGENCE OF ANY PERSON INCLUDING SELLER;

        (d)      all obligations to settle any Imbalances; and

        (e)      all Liabilities and obligations with respect to the Leases and Contracts, including the Contract Cure Amounts.

All such assumed obligations and Liabilities described above in this **Section 12.01** are collectively referred to herein as the **"Assumed Obligations."**

**Section 12.02 Indemnification by Buyer.** Effective as of Closing, Buyer hereby defends, releases, indemnifies and holds harmless the Seller Indemnitees from and against any and all Liabilities caused by, arising from, attributable to or alleged to be caused by, arising from or attributable to (a) any Assumed Obligation or (b) the breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement.

**Section 12.03 Buyer's Environmental Indemnification.** Notwithstanding anything herein to the contrary, in addition to the indemnities set forth in Section 12.02, effective as of the Closing, Buyer and its successors and assigns shall assume (as part of the Assumed Obligations), be responsible for, shall pay on a current basis and defend, indemnify, hold harmless and forever release the Seller Indemnitees from and against any and all Liabilities arising from, based upon, related to or associated with (a) any environmental condition or other environmental matter related or attributable to the Assets, (b) Hazardous Substances, including NORM or (c) Environmental Law including any violation or alleged violation thereof, regardless of whether such Liabilities arose prior to, on or after the Effective Time, including the presence, disposal or removal of any Hazardous Substances, NORM, pollutant, contaminant, or hazardous or toxic substance, waste or material of any kind regulated under any Environmental Law in, on or under the Assets or other property (whether neighboring or otherwise) and including any Liability of any Seller Indemnitees with

respect to the Assets under any Environmental Laws, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601 et. seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et. seq.), the Clean Water Act (33 U.S.C. §§ 466 et. seq.), the Safe Drinking Water Act (14 U.S.C. §§ 1401-1450), the Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 et. seq.), the Toxic Substance Control Act (15 U.S.C. §§ 2601-2629), the Clean Air Act (42 U.S.C. § 7401 et. seq.), the Oil Pollution Act (33 U.S.C. § 2701 et. seq.), any and all amendments to the foregoing, and all state and local Environmental Laws.

**Section 12.04 Negligence and Fault.** THE DEFENSE, RELEASE, INDEMNIFICATION AND HOLD HARMLESS OBLIGATIONS SET FORTH IN THIS AGREEMENT (INCLUDING Section 12.02 AND Section 12.03) SHALL ENTITLE THE INDEMNITEE TO SUCH DEFENSE, RELEASE, INDEMNIFICATION AND HOLD HARMLESS HEREUNDER IN ACCORDANCE WITH THE TERMS HEREOF, REGARDLESS OF WHETHER THE CLAIM GIVING RISE TO SUCH OBLIGATION IS THE RESULT OF: (A) STRICT LIABILITY (INCLUDING UNDER ENVIRONMENTAL LAW), (B) THE VIOLATION OF ANY LAW BY SUCH INDEMNITEE OR BY A PRE-EXISTING CONDITION, OR (C) THE SOLE, CONCURRENT OR COMPARATIVE NEGLIGENCE OF SUCH INDEMNITEE. THE PARTIES ACKNOWLEDGE AND AGREE THAT THE PROVISIONS OF ANY ANTI-INDEMNITY STATUTE RELATING TO OILFIELD SERVICES AND ASSOCIATED ACTIVITIES SHALL NOT BE APPLICABLE TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 12.05 Exclusive Remedy.** From and after Closing, except for the rights of the Parties expressly set forth herein, each of the Parties acknowledges and agrees that its sole and exclusive remedy with respect to any and all Liabilities pursuant to or in connection with this Agreement, the purchase of the Assets by Buyer and the sale of the Assets by Seller, arising from or related to environmental matters or Environmental Law or otherwise in connection with the transactions contemplated hereby shall be limited to the indemnification provisions set forth in this Agreement, if any. Except for the rights of the Parties expressly set forth in this Agreement, effective as of Closing, Buyer, on its own behalf and on behalf of its Affiliates, hereby releases, remises and forever discharges Seller and its Affiliates and all such parties' shareholders, partners, members, board of directors and/or supervisors, officers, employees, agents and representatives from any and all suits, legal or administrative proceedings, claims, demands, damages, losses, costs, Liabilities, interest or causes of action whatsoever, at Law or in equity, known or unknown, which Buyer or its Affiliates might now or subsequently may have, based on, relating to or arising out of this Agreement, the transactions contemplated hereby, the ownership, use or operation of the Assets or the condition, quality, status or nature of the Assets, including rights to contribution under the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et. seq.), breaches of statutory or implied warranties, nuisance or other tort actions, rights to punitive damages, common law rights of contribution and rights under insurance maintained by Seller or any of its Affiliates.

**Section 12.06 Expenses.** Notwithstanding anything herein to the contrary, the foregoing defense, release, indemnity and hold harmless obligations shall not apply to, and each Party shall be solely responsible for, all expenses, including due diligence expenses, incurred by it to enter into, and consummate the transactions contemplated by, this Agreement.

**Section 12.07 Survival.** The representations and warranties of Seller in Article V shall terminate upon the Closing. Unless terminating earlier in accordance with their terms, the covenants and agreements of Seller shall terminate upon the determination of the Final Accounting Statement in accordance with Section 9.02(c) or Section 9.02(d), as applicable. The representations and warranties of Buyer in Article V (other than the representations in Section 5.02(a) - (d) and (g)) shall survive the Closing for a period of eighteen (18) months. Subject to the foregoing, the remainder of this Agreement shall survive the Closing without time limit. Representations, warranties, covenants and agreements shall be of no further force and effect after the date of their expiration; provided, however, that there shall be no termination of any bona fide claim asserted pursuant to this Agreement with respect to such a representation, warranty, covenant or agreement prior to its expiration date.

**Section 12.08 Non-Compensatory Damages.** None of the Buyer Affiliates nor the Seller Indemnitees shall be entitled to recover from Seller or Buyer, or their respective Affiliates, any indirect, consequential, punitive or exemplary damages or damages for lost profits of any kind or loss of business

opportunity arising under or in connection with this Agreement or the transactions contemplated hereby. Subject to the preceding sentence, Buyer, on behalf of each of the Buyer Affiliates, and Seller, on behalf of each of the Seller Indemnitees, waive any right to recover punitive, special, exemplary and consequential damages, including damages for lost profits or loss of business opportunity, arising in connection with or with respect to this Agreement or the transactions contemplated hereby.

**Section 12.09 Indemnification Actions.** All claims for indemnification under this Article XII by Seller or any Seller Indemnitee shall be asserted and resolved as follows:

(a)     For purposes of this Agreement, the term **"Indemnitee"** when used in connection with particular damages shall mean a Seller Indemnitee having the right to be indemnified with respect to such damages pursuant to this Agreement.

(b)     To make claim for indemnification under this **Article XII,** an Indemnitee shall notify Buyer of its claim, including the specific details of and specific basis under this Agreement for its claim (the **"Claim Notice"**). In the event that the claim for indemnification is based upon a claim by a Third Party against the Indemnitee (a **"Claim"**), the Indemnitee shall provide its Claim Notice promptly after the Indemnitee has actual knowledge of the Claim and shall enclose a copy of all papers (if any) served with respect to the Claim; provided that the failure of any Indemnitee to give notice of a Claim as provided in this **Section 12.09** shall not relieve Buyer of its obligations under this **Article XII** except to the extent (and only to the extent of such incremental damages incurred) such failure results in insufficient time being available to permit Buyer to effectively defend against the Claim or otherwise prejudices Buyer's ability to defend against the Claim. In the event that the claim for indemnification is based upon an inaccuracy or breach of a representation, warranty, covenant or agreement, the Claim Notice shall specify the representation, warranty, covenant or agreement that was inaccurate or breached.

(c)     In the case of a claim for indemnification based upon a Claim, Buyer shall have thirty (30) days from its receipt of the Claim Notice to notify the Indemnitee whether or not it agrees to indemnify and defend the Indemnitee against such Claim under this **Article XII.** The Indemnitee is authorized, prior to and during such thirty (30) day period, to file any motion, answer or other pleading that it shall deem necessary or appropriate to protect its interests or those of Buyer and that is not prejudicial to Buyer.

(d)     If Buyer agrees to indemnify the Indemnitee, it shall have the right and obligation to diligently defend, at its sole cost and expense, the Claim. Buyer shall have full control of such defense and proceedings, including any compromise or settlement thereof, subject to the terms hereof. If requested by Buyer, the Indemnitee agrees to cooperate in contesting any Claim which Buyer elects to contest (provided, however, that the Indemnitee shall not be required to bring any counterclaim or cross-complaint against any Person). The Indemnitee may participate in, but not control, at its sole cost and expense, any defense or settlement of any Claim controlled by Buyer pursuant to this **Section 12.09.** An Buyer shall not, without the written consent of the Indemnitee, such consent not to be unreasonably withheld, conditioned or delayed, settle any Claim or consent to the entry of any judgment with respect thereto that (i) does not result in a final resolution of the Indemnitee's Liability with respect to the Claim (including, in the case of a settlement, an unconditional written release of the Indemnitee from all Liability in respect of such Claim) or (ii) may materially and adversely affect the Indemnitee (other than as a result of money damages covered by the indemnity).

(e)     If Buyer does not agree to indemnify the Indemnitee within the thirty (30) day period specified in **Section 12.09(c)** or fails to give notice to the Indemnitee within such thirty (30) day period regarding its election or if Buyer agrees to indemnify, but fails to diligently defend or settle the Claim, then the Indemnitee shall have the right to defend against the Claim (at the sole cost and expense of Buyer, if the Indemnitee is entitled to indemnification hereunder), with counsel of the Indemnitee's choosing; provided, however, that the Indemnitee shall make no settlement, compromise, admission or acknowledgment that would give rise to Liability on the part of any Buyer without the prior written consent of such Buyer, which consent shall not be unreasonably withheld, conditioned or delayed.

in the case of a claim for indemnification not based upon a Claim, Buyer shall have 30 days from its receipt of the Claim Notice to (i) cure the damages complained of, (ii) agree to indemnify the Indemnitee for such damages, or (iii) dispute the claim for such damages. If Buyer does not respond to such Claim Notice within such 30 day period, Buyer will be deemed to dispute the claim for damages.

Section 12.10 **Characterization of Indemnity Payments.** The Parties agree that any indemnity payments made pursuant to this Article XII shall be treated for all Tax purposes as an adjustment to the Purchase Price unless otherwise required by Law.

## ARTICLE XIII. DISCLAIMERS OF REPRESENTATIONS AND WARRANTIES

(a) EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN **Section 5.01** OF THIS AGREEMENT, (I) SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED AND (II) SELLER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING, WITHOUT LIMITATION, ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY OFFICER, DIRECTOR, SUPERVISOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF SELLER OR ANY OF ITS AFFILIATES).

(b) EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN **Section 5.01,** AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (I) TITLE TO OR ANY LIENS OR ENCUMBRANCES AFFECTING ANY OF THE ASSETS, (II) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS, (III) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ASSETS, (IV) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (V) THE PRODUCTION OF HYDROCARBONS FROM THE ASSETS, (VI) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSETS, (VII) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION (FINANCIAL OR OTHERWISE), MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY SELLER OR THIRD PARTIES WITH RESPECT TO THE ASSETS, (VIII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO BUYER, ITS AFFILIATES OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, AND (IX) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT.

(c) EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN **Section 5.01,** SELLER EXPRESSLY DISCLAIMS AND NEGATES, AND BUYER HEREBY WAIVES (I) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (II) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (III) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, (IV) ANY RIGHTS OF PURCHASERS UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION, (V) ANY CLAIMS BY BUYER FOR DAMAGES BECAUSE OF DEFECTS OR FLAWS IN THE SALE OR ASSETS, WHETHER KNOWN OR UNKNOWN AS OF THE EFFECTIVE TIME OR THE CLOSING DATE, AND (VI) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER APPLICABLE LAW; IT BEING THE EXPRESS INTENTION OF BOTH BUYER AND SELLER THAT, EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN **Section**

SALE OF THIS AGREEMENT, THE ASSETS SHALL BE CONVEYED TO BUYER IN THEIR PRESENT CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS," WITH ALL FAULTS, AND THAT BUYER HAS MADE OR SHALL MAKE PRIOR TO CLOSING SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE.

(d)     OTHER THAN EXPRESSLY SET FORTH IN **Section 5.01(k)** OF THISAGREEMENT, SELLER HAS NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING ANY MATTER OR CIRCUMSTANCE RELATING TO ENVIRONMENTAL LAWS, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT, THE PROTECTION OF HUMAN HEALTH, SAFETY, NATURAL RESOURCES OR THE ENVIRONMENT OR ANY OTHER ENVIRONMENTAL CONDITION OF THE ASSETS, AND NOTHING IN THIS AGREEMENT OR OTHERWISE SHALL BE CONSTRUED AS SUCH A REPRESENTATION OR WARRANTY. UPON CLOSING, BUYER SHALL BE DEEMED TO BE TAKING THE ASSETS "AS IS" AND "WHERE IS," WITH ALL FAULTS FOR PURPOSES OF THEIR ENVIRONMENTAL CONDITION, AND BUYER ACKNOWLEDGES IT HAS MADE OR CAUSED TO BE MADE SUCH ENVIRONMENTAL INSPECTIONS AS BUYER DEEMS APPROPRIATE.

(e)     AS PARTIAL CONSIDERATION FOR THIS AGREEMENT, EACH PARTY HEREBY EXPRESSLY WAIVES THE PROVISIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT, ARTICLES 17.41 ET SEQ. OF THE TEXAS BUSINESS & COMMERCE CODE, OTHER THAN ARTICLE 17.555 WHICH IS NOT WAIVED, AND ALL OTHER CONSUMER PROTECTION LAWS OF THE STATE OF TEXAS THAT MAY BE WAIVED BY THE PARTIES TO THE EXTENT PERMITTED BY APPLICABLE LAW.

(f)     SELLER AND BUYER AGREE THAT THE DISCLAIMERS OF CERTAIN WARRANTIES CONTAINED IN THIS **Article XIII** ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW, RULE OR ORDER.

## ARTICLE XIV. MISCELLANEOUS

**Section 14.01 Transfer Taxes.** All sales, use or other similar Taxes (other than, for the avoidance of doubt, Income Taxes) and duties, levies or other governmental charges, if any, incurred by or imposed with respect to the transfer undertaken pursuant to this Agreement ("Transfer Taxes") shall be the responsibility of, and shall be paid by, Buyer.

**Section 14.02 Cooperation on Tax Returns and Tax Proceedings.** Buyer and Seller shall cooperate fully as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes imposed on or with respect to the Assets.

**Section 14.03 Filings, Notices and Certain Governmental Approvals.** As soon as reasonably possible after the Closing, but in no event later than thirty (30) days after such Closing, unless otherwise consented to in writing by Seller, Buyer shall remove the names of Seller and its Affiliates, and all variations thereof, from the Assets. Promptly after Closing, Buyer shall make all requisite filings with, and provide the requisite notices to, the appropriate Governmental Authorities to accomplish all transactions contemplated by this Agreement.

**Section 14.04 Entire Agreement.** This Agreement, the documents to be executed pursuant hereto and the exhibits and schedules attached hereto constitute the entire agreement between the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties pertaining to the subject matter hereof. No supplement, amendment, alteration, modification, waiver or termination of this Agreement shall be binding unless executed in writing by the Parties and specifically referencing this Agreement as being supplemented, amended, altered, modified, waived or terminated.

**Section 14.05 Waiver.** No waiver of any of the provisions of this Agreement or rights hereunder shall be deemed or shall constitute a waiver of any other provisions hereof or right hereunder (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**Section 14.06 Publicity.** Each Party shall consult with the other Party prior to making any public release concerning this Agreement or the transactions contemplated hereby and, except as required by applicable Law or by any Governmental Authority or stock exchange, no Party shall issue any such release without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.

**Section 14.07 No Third Party Beneficiaries.** Except with respect to the Persons included within the definition of Seller Indemnitees (and in such cases, only to the extent expressly provided herein), nothing in this Agreement shall provide any benefit to any Third Party or entitle any Third Party to any claim, cause of action, remedy or right of any kind, it being the intent of the Parties that this Agreement shall not be construed as a Third Party beneficiary contract.

**Section 14.08 Assignment.** Buyer may not assign or delegate any of its rights or duties hereunder without the prior written consent of Seller and any assignment made without such consent shall be void. Any assignment made by Buyer as permitted hereby shall not relieve Buyer from any Liability or obligation hereunder. Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors, assigns and legal representatives.

**Section 14.09 GOVERNING LAW; VENUE; WAIVER OF JURY TRIAL.** THIS AGREEMENT AND THE LEGAL RELATIONS AMONG THE PARTIES SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT MIGHT REFER CONSTRUCTION OF SUCH PROVISIONS TO THE LAWS OF ANOTHER JURISDICTION, EXCEPT TO THE EXTENT THE LAWS OF TEXAS OR LOUISIANA ARE MANDATORILY APPLICABLE TO TITLE AND REAL PROPERTY MATTERS. ALL ACTIONS AND PROCEEDINGS WITH RESPECT TO, ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, RELATED TO, OR FROM THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE EXCLUSIVELY LITIGATED, HEARD AND DETERMINED IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION AND AUTHORITY OF THE BANKRUPTCY COURT TO HEAR AND DETERMINE ANY SUCH ACTION OR PROCEEDING; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY CASE IS CLOSED, THE PARTIES HEREBY UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF TEXAS OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF TEXAS. EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 14.10 Notices.** Any notice, communication, request, instruction or other document required or permitted hereunder shall be given in writing and delivered in person or sent by United States mail (postage prepaid, return receipt requested), telex, facsimile or telecopy to the addresses of Seller and Buyer set forth below. Any such notice shall be effective upon receipt only if received during normal business hours or, if not received during normal business hours, on the next Business Day.

Seller:          [Luca International Group, LLC]

                                    _____

                                    Houston, Texas 77024
                                    Attn: Loretta R. Cross, CRO
                                    Telephone:    [    ]
                                    Facsimile: [ ]

Buyer:          [Buyer]

Either Party may, by written notice so delivered, change its address for notice purposes hereunder.

      **Section 14.11 Severability.** If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to either Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

      **Section 14.12 Counterparts.** This Agreement may be executed in any number of counterparts, and each counterpart hereof shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. Any signature hereto delivered by a Party by facsimile or electronic transmission shall be deemed an original signature hereto.

      **Section 14.13 Approval of the Bankruptcy Court.** Notwithstanding anything herein to the contrary, any and all obligations under this Agreement are subject to approval of the Bankruptcy Court.

      **Section 14.14 Amendment.** This Agreement may be amended only by an instrument in writing executed by all Parties.

      **Section 14.15 Schedules and Exhibits.** The inclusion of any matter upon any Schedule or any Exhibit attached hereto does not constitute an admission or agreement that such matter is material with respect to the representations and warranties contained herein.

      **Section 14.16 Time of the Essence.** Time is of the essence in this Agreement and with respect to the covenants, obligations and agreements evidenced hereby.

*[Signature page follows]*

**IN WITNESS WHEREOF,** Seller and Buyer have executed this Agreement as of the date first written above.

<div style="margin-left: 50%;">

**SELLER:**

**LUCA INTERNATIONAL GROUP, LLC**
a [_____ ]


By: _____
Name:_____
Title:_____


**BUYER:**

**[BUYER],**
a [    ]


By: _____
Name:_____
Title:_____

</div>

*Signature Page to Purchase and Sale Agreement*